EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Yalí Acevedo Feliciano, et al.<br><br>Peticionarios<br><br>v.<br><br>Iglesia Católica Apostólica y Romana, et al.<br><br>Recurridos<br><br><br><br>Sonia Arroyo Velázquez, et al.<br><br>Peticionarios<br><br>v.<br><br>Iglesia Católica, Apostólica y Romana, et al.<br><br>Recurridos<br>_____<br><br>Elsie Alvarado Rivera, et al.<br><br>Peticionarios<br><br>v.<br><br>Iglesia Católica, Apostólica y Romana, et al.<br><br>Recurridos | Certiorari<br><br>2018 TSPR 106<br><br>200 DPR ____ |

Número del Caso: CC-2018-475

Fecha: 11 de junio de 2018

Tribunal de Apelaciones:

    Región Judicial de San Juan, Panel especial

Abogados de la parte peticionaria:

    Lcdo. Antonio Bauzá Santos
    Lcdo. Germán Brau Ramírez

Abogados de los recurridos:

**Iglesia Católica, Apostólica y Romana**
**Arquidiócesis de San Juan**
**Superintendencia de las Escuelas Católicas**

       Lcdo. José J. Santiago Meléndez
       Lcdo. José A. Ruiz García
       Lcdo. Pedro Busó García


**Fideicomiso Plan de Pensión para**
**Empleados de Escuelas Católicas**

       Lcda. Eda Mariel Ayala Morales
       Lcdo. Jesús R. Rabell Méndez
       Lcdo. Frank Zorrilla Maldonado

**Academia San José**

       Lcdo. Jesús Jiménez González-Rubio


**Academia Nuestra Señora del Perpetuo Socorro, Inc.**

       Lcdo. Carlos Padilla Velez
       Lcda. Alina Ortiz César


Materia: Derecho constitucional: Cláusulas constitucionales sobre separación de Iglesia y Estado y Libertad de culto. Personalidad jurídica de la Iglesia Católica, Apostólica y Romana en Puerto Rico. Procedencia de un embargo en aseguramiento de sentencia y un interdicto preliminar sin prestar fianza. Alcance del Art. 9.08 de la Ley General de Corporaciones de Puerto Rico


Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | | |
|---|---|---|
| Yalí Acevedo Feliciano, *et al.*<br><br>    Peticionarios<br><br>v.<br><br>Iglesia Católica Apostólica y Romana, *et al.*<br><br>    Recurridos | | |
| Sonia Arroyo Velázquez, *et al.*<br><br>    Peticionarios<br><br>v.<br><br>Iglesia Católica, Apostólica y Romana, *et al.*<br><br>    Recurridos | CC-2018-0475 | *Certiorari* |
| Elsie Alvarado Rivera, *et al.*<br><br>    Peticionarios<br><br>v.<br><br>Iglesia Católica, Apostólica y Romana, *et al.*<br><br>    Recurridos | | |

El Juez Asociado señor ESTRELLA MARTÍNEZ emitió la Opinión del Tribunal

(Regla 50)

San Juan, Puerto Rico, a 11 de junio de 2018.

Hoy tenemos la obligación de atender la reclamación de cientos de maestros, empleados y exempleados de varios colegios y academias católicas (peticionarios), los cuales han dedicado gran porción de su vida a la enseñanza, educación y formación de parte de varias generaciones en Puerto Rico. Para ello, el presente caso exige analizar y aclarar varios contornos de nuestro ordenamiento jurídico y atender varias controversias noveles y de alto interés público. A tales fines, nos corresponde analizar lo siguiente: (1) si la Iglesia Católica, Apostólica y Romana en Puerto Rico (Iglesia Católica) ostenta personalidad jurídica; (2) si las divisiones y componentes de ésta poseen personalidad jurídica propia y separada; (3) la procedencia de un embargo en aseguramiento de sentencia y un interdicto preliminar sin la prestación de fianza; (4) si existe vínculo contractual alguno que tenga como efecto que los patronos participantes en un plan de retiros respondan subsidiariamente por éste, y (5) el alcance del Art. 9.08 de la Ley General de Corporaciones de Puerto Rico, infra.

Con eso en mente, procedamos a puntualizar el contexto fáctico y procesal en el cual se desarrolla la presente controversia.

I

El 6 de junio de 2016, los peticionarios, correspondientes a la Academia Perpetuo Socorro, presentaron su demanda inicial en la que sostuvieron que son

beneficiarios del Plan de Pensión para Empleados de Escuelas Católicas (Plan), administrado por el Fideicomiso Plan de Pensión para Empleados de Escuelas Católicas (Fideicomiso).[1] Arguyeron, además, que el Fideicomiso les notificó sobre la terminación del Plan y la eliminación de sus beneficios de retiro. Ante eso, argumentaron que poseen derechos adquiridos sobre el Plan, los cuales no pueden ser eliminados retroactivamente. Asimismo, éstos solicitaron en la demanda varios remedios provisionales, a saber, un embargo en aseguramiento de sentencia y un interdicto preliminar. Posteriormente, se presentaron demandas análogas, solicitando los mismos remedios, por empleados de la Academia San José y la Academia San Ignacio, las cuales fueron consolidadas por el Tribunal de Primera Instancia.[2]

Evaluada la solicitud de los peticionarios, el foro primario denegó los remedios provisionales. Ese dictamen fue oportunamente recurrido al Tribunal de Apelaciones, el cual, de igual forma, denegó otorgar los remedios solicitados. Inconformes, los peticionarios acudieron ante nos. En esa

---

[1] El Plan de Pensión para Empleados de Escuelas Católicas (Plan) que funge como eje central de esta controversia, comenzó a operar en el 1979. La Superintendencia de Escuelas Católicas (Superintendencia), ese mismo año, constituyó el Fideicomiso Plan de Pensión para Empleados de Escuelas Católicas (Fideicomiso) para fines de que éste operara el Plan y agrupar a los cuarenta y dos colegios y academias que participarían del mismo.

[2] Las demandas incluyeron como demandados a la Iglesia Católica, la Arquidiócesis de San Juan, la Superintendencia, la Academia Perpetuo Socorro, la Academia San José, la Academia San Ignacio y el Fideicomiso.

ocasión, este Tribunal acogió el recurso presentado y emitimos una Sentencia, revocando al foro apelativo intermedio. Véase, Acevedo Feliciano, *et al.* v. Iglesia Católica, Apostólica y Romana, *et al.*, res. el 18 de julio de 2017, CC-2016-1053. A esos efectos, dictaminamos que procedía otorgar el remedio de interdicto preliminar. De igual modo, concluimos que de los documentos del Plan surgen varias cláusulas que atienden la responsabilidad de los patronos participantes para con los beneficiarios del mismo. Íd. págs. 9-10. Es decir, dispusimos que entre el Fideicomiso y los patronos participantes existe un vínculo obligacional subsidiario para con los beneficiarios. Por medio de esa relación, del Fideicomiso no contar con los fondos necesarios para cumplir con sus responsabilidades, serían los patronos participantes los obligados a cumplir.

A raíz de esa conclusión, y al existir controversia sobre cuáles demandados en el pleito ostentaban personalidad jurídica, ordenamos al foro primario a celebrar una vista, a los fines de determinar quién sería responsable de continuar con los pagos de las pensiones, en virtud del interdicto preliminar. Es decir, si esa responsabilidad recaía en "las correspondientes Academias o la Iglesia". Acevedo Feliciano, *et al.* v. Iglesia Católica, Apostólica y Romana, *et al.*, supra, pág. 12.

Devuelto el caso al Tribunal de Primera Instancia, éste celebró la vista ordenada. En su correspondiente Resolución, ese foro determinó que el único demandado con personalidad

jurídica propia era la Iglesia Católica. Ello, pues ni la Academia San José ni la Academia San Ignacio habían sido debidamente incorporados. A su vez, determinó que la Academia Perpetuo Socorro le fue revocado su certificado de incorporación el 4 de mayo de 2014. Luego de varios trámites procesales, el foro primario le concedió a la Iglesia Católica un término de veinticuatro horas para consignar la suma de $4.7 millones y le apercibió que, de incumplir con su Orden, procedería a ordenar el embargo de sus cuentas bancarias. Inconformes con ese proceder, el mismo día, los recurridos acudieron ante el Tribunal de Apelaciones vía *certiorari* y *en Auxilio de Jurisdicción* el cual efectivamente ordenó la paralización de los procedimientos ante el Tribunal de Primera Instancia.

Así las cosas, luego de ponderados los argumentos de las partes, el foro apelativo intermedio emitió una Sentencia en la cual revocó en su totalidad la Resolución emitida por el foro primario. En primer término, determinó que la Iglesia Católica es un ente inexistente en Puerto Rico. A esos efectos, dispuso que los diferentes componentes de las entidades que constituyen la Iglesia Católica en Puerto Rico ostentan personalidades jurídicas propias y separadas uno de los otros. En ese sentido, concluyó, que tanto la Orden de embargo como la de interdicto preliminar, eran inoficiosas, toda vez que se dirigen en contra de un ente inexistente.

Por otra parte, el Tribunal de Apelaciones determinó que no procedía trasladar directamente a los patronos individualmente la obligación de pagar la pensión que recibían los empleados, puesto que esa era responsabilidad estrictamente del Fideicomiso.

Asimismo, el foro apelativo intermedio concluyó que la Orden de embargo y el interdicto preliminar eran improcedentes, pues los peticionarios no habían prestado la fianza requerida por las Reglas de Procedimiento Civil.

Por último, sostuvo que la Academia Perpetuo Socorro poseía personalidad jurídica, ya que logró renovar su certificado de incorporación en el 2017, a pesar de que el mismo había sido cancelado el 16 de abril de 2014. De esa forma, razonó que se le debía reconocer personalidad jurídica retroactiva a los actos llevados a cabo durante ese tiempo, dado que actuó dentro del término de tres años dispuesto en el Art. 9.08 de la Ley General de Corporaciones de Puerto Rico, 14 LPRA sec. 3708.3.

Por consiguiente, los peticionarios acuden ante nos señalando como errores las conclusiones de derecho antes mencionadas. Contando con el beneficio de la comparecencia de las partes procedemos a disponer del recurso ante nuestra consideración.[3] Veamos.

---

[3]Durante el trámite del presente caso, se presentaron ante la Secretaría de este Tribunal varias solicitudes de intervención o para comparecer como *amicus curiae*. Los solicitantes fueron las Diócesis de Caguas, Arecibo, Mayagüez, Fajardo-Humacao y Ponce. No obstante, concluimos que los intereses de esas instituciones han estado

**II**

**A.**

Con tal de disponer adecuadamente de la controversia plasmada ante nos, resulta importante explicar el contexto jurídico e histórico por el cual se le reconoce personalidad jurídica a la Iglesia Católica en Puerto Rico. La relación entre España, la Iglesia Católica y Puerto Rico es una de carácter *sui generis*, dadas las particularidades de su desarrollo y contexto histórico. Sabido es que, para la época durante la cual Puerto Rico era una colonia española, la Iglesia Católica formaba, *de facto y de jure*, parte del Estado. Por tal razón, la Iglesia Católica estaba sumamente inmiscuida en las relaciones jurídicas en las que el Estado se involucraba. Ahora bien, posterior a la Guerra Hispanoamericana, Puerto Rico fue cedido a los Estados Unidos, acto que fue concretizado con la firma del Tratado de París. En ese sentido, y según ha expuesto este Tribunal:

> Puerto Rico pasó a formar parte del esquema constitucional de Estados Unidos como resultado de la Guerra Hispanoamericana. Mediante el Tratado de París de 1898, la soberanía de Puerto Rico fue cedida a los Estados Unidos —Art. II, Tratado de París, L.P.R.A., Tomo 1— y se estableció que los derechos de los habitantes de la Isla serían definidos por el Congreso. Íd., Art. IX. De suerte que desde inicios de nuestra relación con Estados Unidos, la manera en la cual la Constitución Federal aplicaría a Puerto Rico fue objeto de

---

debidamente representados por la parte recurrida. Por tal motivo, declaramos sin lugar las mismas.

intensos debates. <u>ELA v. Northwestern Selecta</u>, 185 DPR 40, 61 (2012).[4]

En virtud del referido Tratado, además, se le reconoció a la Iglesia Católica la personalidad jurídica que ésta ostentaba previo a la cesión de Puerto Rico a los Estados Unidos. En otras palabras, el "Tratado de París, mantuvo la personalidad jurídica de la Iglesia". J.J. Monge Gómez, <u>La permisibilidad de lo "impermisible": La Iglesia sobre el Estado</u>, 41 Rev. Jur. U. Inter. PR 629, 633-634 (2007). Lo anterior se desprende del Art. 8 del Tratado el cual reza como sigue:

> Queda por lo tanto declarado que esta renuncia o cesión, según el caso, a que se refiere el párrafo anterior, en nada puede mermar la propiedad, o los derechos que correspondan, con arreglo a las leyes, al poseedor pacífico, de los bienes de todas clases de las provincias, municipios, establecimientos públicos o privados, corporaciones civiles o eclesiásticas, o de cualesquiera otras colectividades que tienen personalidad jurídica para adquirir y poseer bienes en los mencionados territorios renunciados o cedidos, y los de los individuos particulares, cualquiera que sea su nacionalidad. Tratado de Paz entre Estados Unidos de América y el Reino de España (Tratado de París), art. 8, 10 de diciembre de 1898, EE.UU.-España, 30 Stat. 1754 (1898), T.S. 343.

Nótese que no se hace referencia directa a la Iglesia Católica, sino que se hace alusión a corporaciones eclesiásticas. Ahora bien, el Tribunal Supremo de los Estados Unidos estableció que la palabra "eclesiásticas" en el

---

[4]Para una actualización de las diversas posturas en ese debate, véase G.A. Gelpí, <u>The Constitutional Evolution of Puerto Rico and other U.S Territories (1898-Present)</u>, 1ra ed., Colombia, Ed. Nomos S.A., 2017.

precitado artículo se refería estrictamente a la Iglesia Católica, puesto que era la única organización eclesiástica existente en Puerto Rico al momento de firmar el Tratado de París. Específicamente, en su análisis, el Tribunal Supremo federal determinó lo siguiente:

> The Roman Catholic Church has been recognized as possessing legal personality by the treaty of Paris, and its property rights solemnly safeguarded. In so doing the treaty has merely followed the recognized rule of international law which would have protected the property of the church in Porto [sic] Rico subsequent to the cession. This juristic personality and the church's ownership of property had been recognized in the most formal way by the concordats between Spain and the papacy, and by the Spanish laws from the beginning of settlements in the Indies. Such recognition has also been accorded the church by all systems of European law from the fourth century of the Christian era. Ponce v. Roman Catholic Apostolic Church, 210 U.S. 296, 323-324 (1908).

A pesar de ello, el foro apelativo intermedio entendió que cada división de la Iglesia Católica en Puerto Rico equivale a la creación de una persona jurídica distinta y separada y no reconoció la personalidad jurídica de la Iglesia Católica. Ello, a base de una sustitución del estado de derecho local por el Derecho Canónico, cuyo ámbito en la controversia ante nos, se limita a regir las relaciones y los procesos internos de la Iglesia Católica. Véase, Marianne Perciaccante, The Courts and Canon Law, 6 Cornell J.L. & Pub. Pol'y 171 (1996).

En consecuencia, el Tribunal de Apelaciones erradamente entró a analizar los argumentos de los recurridos respecto a la cláusula constitucional que establece la separación de

Iglesia y Estado. Ello pues, según los recurridos, se deben respetar las determinaciones internas de la Iglesia Católica, en cuanto a cómo administrar sus instituciones. Ante la naturaleza contractual de la controversia ante nos, no les asiste la razón.

Interpretando la referida cláusula constitucional, el Tribunal Supremo de los Estados Unidos estableció lo siguiente:

> The "establishment of religion" clause of the First Amendment means at least this: Neither a state nor the Federal Government can set up a church. Neither can pass laws which aid one religion, aid all religions, or prefer one religion over another. Neither can force nor influence a person to go to or to remain away from church against his will or force him to profess a belief or disbelief in any religion. No person can be punished for entertaining or professing religious beliefs or disbeliefs, for church attendance or non-attendance. No tax in any amount, large or small, can be levied to support any religious activities or institutions, whatever they may be called, or whatever form they may adopt to teach or practice religion. Neither a state nor the Federal Government can, openly or secretly, participate in the affairs of any religious organizations or groups and vice versa. Everson v. Bd. of Ed. of Ewing Twp., 330 U.S. 1, 15-16 (1947). Véase además, Academia San Jorge v. J.R.T., 110 DPR 193 (1980).

De igual modo, a base de esa misma disposición, el máximo foro federal ha invalidado actuaciones judiciales estatales que desembocan en una intromisión indebida de parte de esos tribunales sobre asuntos de organización o disputas internas (intrachurch dispute) o "materias de doctrina y fe" de la iglesia. Véanse, Jones v. Wolf, 443 U.S. 595 (1979); Serbian E. Orthodox Diocese for U. S. of Am. & Canada v. Milivojevich,

426 U.S. 696 (1976). Por ello, el Tribunal Supremo federal ha avalado lo denominado como el "neutral principles of law approach". Jones v. Wolf, supra, págs. 602-603. Bajo ese análisis, los tribunales pueden dirimir ciertas controversias de la Iglesia, como por ejemplo derecho sobre propiedad, siempre y cuando la adjudicación no tome en consideración ni indague materias de doctrina y fe. Íd., págs. 602-603. Ello, sin ir en contravención de la cláusula constitucional sobre separación de Iglesia y Estado. Como corolario de lo anterior, ese foro ha expresado que "[the First] Amendment therefore commands civil courts to decide church property disputes without resolving underlying controversies over religious doctrine. This principle applies with equal force to church disputes over church polity and church administration". Serbian E. Orthodox Diocese for U. S. of Am. & Canada v. Milivojevich, supra, pág. 710.

Adviértase que, en el caso de autos, nos encontramos ante obligaciones civiles voluntariamente contraídas, no impuestas por el Estado. En ese sentido, según expuso este Tribunal en Mercado, Quilichini v. U.C.P.R., 143 DPR 610 (1997):

> [D]ebe quedar claro que[,] aunque una de las partes en el litigio de autos es una institución educativa que reclama la no intervención de los tribunales por estar involucradas reclamaciones que podrían conducir a dilucidar asuntos de índole religiosa, podemos y debemos distinguir los distintos planteamientos ante nuestra consideración. Específicamente, en esta parte de la discusión, solamente examinamos el

planteamiento de incumplimiento contractual. En ese sentido, no existe duda en cuanto a la autoridad que tiene un tribunal civil para intervenir en la interpretación de un contrato "libremente negociado y acordado" entre dos (2) entes privados. Díaz v. Colegio Nuestra Sra. del Pilar, 123 DPR 765 (1989). La intervención del tribunal intenta hacer cumplir la voluntad de las partes y vindicar sus intereses contractuales. En Díaz v. Colegio Nuestra Sra. del Pilar, supra, aclaramos que la participación del Estado a través de los tribunales en disputas contractuales no es penetrante e incisiva en la operación de una institución educativa católica al punto de constituir una carga sustancial al libre ejercicio del culto ni promover el establecimiento de cualquier religión, según proscriben la Primera Enmienda de la Constitución de Estados Unidos y el Art. II, Sec. 3 de la Constitución del Estado Libre Asociado, L.P.R.A., Tomo 1. Por lo tanto, siempre que la dilucidación de la disputa contractual no requiera pasar juicio sobre materias de doctrina, de fe o de organización eclesiástica interna, los tribunales civiles podrán ejercer jurisdicción. Íd., págs. 626-627.

Conforme a lo pautado, resulta imperativo concluir que este Tribunal se encuentra en igual posición en el presente caso. Nótese, en primer lugar, que es claro que en el caso de autos no se encuentran en controversia "materias de doctrina y fe" de la Iglesia Católica. Lejos de enfrentarnos a asuntos puramente internos (intrachurch dispute), ciertamente la controversia ante nuestra consideración está enmarcada en asuntos externos de la Iglesia Católica, en su rol como patrono, frente a los empleados peticionarios, en una disputa de índole puramente contractual. Y es que cuando los tribunales nos enfrentamos ante controversias seculares, como la que nos ocupa, no podemos otorgarles entera deferencia a las decisiones internas de ésta, por no ser una controversia de organización interna o materia de doctrina y

fe. Perciaccante, supra, págs. 171-172 y 178. Máxime, cuando actuar de esa forma constituiría en sí misma una violación a la cláusula constitucional que establece la separación de Iglesia y Estado. Íd., pág. 172; Serbian E. Orthodox Diocese for U. S. of Am. & Canada v. Milivojevich, supra, págs. 708-710.

Tampoco hay espacio para imputar una violación a la garantía de la Primera Enmienda de la Constitución Federal por la cual toda persona tiene el derecho de ejercer libremente su religión sin que sea obstaculizado, restringido o coartado por el gobierno, la cual aplica a los estados en virtud de la Decimocuarta Enmienda de la Constitución Federal. Everson v. Board of Education, supra. Según explicado, no estamos ante una regulación o interferencia del Gobierno que pretenda imponer una carga sustancial a determinada religión. Nos explicamos.

Primero, la controversia civil planteada ante nos versa sobre acuerdos que la parte recurrida contrajo de forma voluntaria con los maestros demandantes. Segundo, esos acuerdos están sustentados en unas normas de Derecho Civil y Corporativo de aplicación general. Tercero, la parte recurrida no demostró que esas leyes constituían una carga sustancial en el ejercicio de su religión. Véase, Holt v. Hobbs, 135 S.Ct. 853, 857-859 (2015); Burwell v. Hobby Lobby Stores, Inc., 134 S.Ct. 2751, 2760-2762 (2014). Muy distinto sería que el Gobierno de Puerto Rico interfiriera con las normas internas de reclutamiento de ministros o sacerdotes

de alguna o todas las iglesias, porque como bien dictaminó el Tribunal Supremo federal, constituiría una interferencia indebida con las normas internas de las iglesias. <u>Véase</u>, <u>Hosana-Tabor Evangelical Lutheran Church and School v. EEOC</u>, 565 U.S. 171 (2012). Por el contrario, aquí estamos ante una controversia puramente contractual regida por el derecho local, entre partes privadas. Es decir, la personalidad jurídica que le reconocemos a la Iglesia Católica no incide sobre la garantía constitucional antes mencionada, pues esa determinación en nada interfiere sustancialmente con su organización interna o alguna "materia de doctrina y fe". Con nuestro proceder, meramente aclaramos la capacidad jurídica de la Iglesia Católica en Puerto Rico para con sus responsabilidades civiles frente a personas externas a ella.

En segundo lugar, la controversia en este caso, y distinto a como fue apreciada por el Tribunal de Apelaciones, no requiere que evaluemos o califiquemos como correctas o incorrectas las determinaciones internas o la "organización eclesiástica interna" de la Iglesia Católica- independientemente como opte por hacerla-, sino si la referida organización es capaz de conceder o negar, por si sola, personalidad jurídica independiente a una o varias de las estructuras internas. Veamos.

Contrario a lo concluido por el foro apelativo intermedio, resulta innegable **que cada ente creado que opere separado y con un cierto grado de autonomía a la Iglesia Católica es en realidad una fragmentación de un sólo ente**

**poseedor de personalidad jurídica**. J. Gelpí Barrios, Personalidad jurídica de la Iglesia en Puerto Rico, 95 Rev. Esp. Der. Canónico 395, 403 y 410 (1977); A. Colón Rosado, Relation Between Church and State in Puerto Rico, 46 Rev. Jur. Col. Ab. 51, 54-57 (1985). En otras palabras, las entidades creadas como consecuencia de cualquier configuración interna de la Iglesia Católica no equivalen automáticamente a la formación de entes con personalidades jurídicas distintas y separadas en el ámbito del Derecho Civil. Ello, puesto que más bien son meras fragmentaciones indivisibles de la personalidad jurídica que posee la Iglesia Católica.

La contención de que la Iglesia Católica está autorizada a obviar el Derecho Corporativo local y puede establecer entes con personalidad jurídica por decreto o bula papal, desde Roma, es —para todo efecto práctico— el reconocimiento de una religión oficial o privilegiada en Puerto Rico. Eso está vedado por la Primera Enmienda de la Constitución de los Estados Unidos y el Art. II, Sec. 3 de la Constitución de Puerto Rico. Véanse, Everson v. Board of Education, supra; Academia San Jorge v. J.R.T., supra.

Ante lo expuesto, resulta incuestionable que la Iglesia Católica goza y ostenta de personalidad jurídica propia en Puerto Rico. Por ello, a diferencia de otras instituciones religiosas, a ésta no le es requerido el llevar a cabo un acto formal de incorporación con tal de poseer capacidad jurídica. Como cuestión de hecho, esa realidad se recoge en

el Registro de Corporaciones del Departamento de Estado de Puerto Rico.[5] Así, en la medida que las entidades creadas por la Iglesia Católica funjan como *alter egos* o entidades *doing business as* de ésta, sin someterse independientemente a un proceso ordinario de incorporación (como en su momento lo hizo la Academia Perpetuo Socorro) constituirán meras fragmentaciones indivisibles de la Iglesia Católica, sin personalidad jurídica propia. Ante ese cuadro, el Tribunal de Apelaciones erró al suplantar el derecho vigente expuesto por normas no vinculantes.

**B.**

Como es sabido, una de las características medulares de las corporaciones es que las mismas poseen personalidad jurídica propia, separada y distinta a la de sus incorporadores y accionistas. Véase, C.E. Díaz Olivo, Corporaciones: Tratado sobre Derecho Corporativo, Colombia, [s. Ed], 2016, págs. 2 y 45; M. Muñoz Rivera, Ley de Corporaciones de Puerto Rico: Análisis y Comentarios, 1ra ed., San Juan, Ed. Situm, 2015, pág. 7. Esa personalidad jurídica es duradera hasta tanto la corporación se disuelva o se extinga. Miramar Marine, *et al.* v. Citi Walk, *et al.*, 198 DPR 684, 691 (2017). En lo relevante a la controversia ante nos, el Art. 9.08 de la Ley General de Corporaciones de Puerto Rico, supra, dispone ciertas instancias en las cuales,

---

[5]Certificado del Departamento de Estado, Apéndice del *certiorari*, págs. 787-789.

a pesar de la disolución o extinción de una corporación, la misma tendrá personalidad jurídica para ciertos propósitos.

El precitado artículo adopta en Puerto Rico lo que es conocido como los survival statutes. Miramar Marine, *et al.* v. Citi Walk, *et al.*, supra, pág. 693. El mismo tiene como propósito el culminar adecuada y completamente el proceso de liquidación de una corporación. Íd. Es por ello que, como se desprende del mismo texto del referido artículo, se le provee personalidad jurídica a corporaciones extinguidas con el propósito de que éstas puedan continuar con sus litigios pendientes y atender aquellas reclamaciones judiciales instauradas dentro de los tres años siguientes a su disolución o extinción. Sin embargo, el mismo artículo aclara que "[n]o podrá continuar la personalidad jurídica con el propósito de continuar los negocios para los cuales se creó dicha corporación". Ley General de Corporaciones de Puerto Rico, supra. Véase además, 16A Fletcher Cyc. Corp., secs. 8112.3 y 8117 (2012). Es decir, la personalidad jurídica de una corporación liquidada o extinguida es limitada, puesto que no se le reconocerá la misma para fines de continuar con sus negocios, como si nunca hubiera sido extinguida o liquidada. Sin embargo, lo anterior no equivale a poder demandar a una corporación extinguida o liquidada dentro de los tres años siguientes a su extinción por actos llevados a cabos dentro de ese mismo término. De una interpretación de ese artículo se revela que la causa de acción ejercitada tuvo que haber surgido durante la existencia de la corporación que se intenta

demandar. De ese modo, el referido artículo brinda un término para que una parte afectada pueda instar un pleito contra la corporación, a pesar de que la misma haya dejado de existir.

A la luz de lo anterior, resolvemos que el foro apelativo intermedio erró en reconocer la personalidad jurídica de la Academia Perpetuo Socorro. Según expusimos, el Art. 9.08 de la Ley General de Corporaciones de Puerto Rico, supra, provee un término de tres (3) años posterior a la extinción de una corporación para ejercitar causas de acciones y derechos que hayan surgido durante la vigencia de ésta. A la luz de los hechos expuestos, es evidente que la causa de acción en cuestión surgió en el 2016, con el anuncio del Fideicomiso en cuanto al cese del Plan y el impago de las pensiones. Por lo tanto, no procedía reconocerle personalidad jurídica a la Academia Perpetuo Socorro, toda vez que las actuaciones que se reclaman fueron efectuadas con posterioridad a la revocación del certificado de incorporación de ésta.

## III

Según fue expuesto, los peticionarios señalan que la sentencia recurrida erróneamente determinó que no existía fuente obligacional entre ellos y su patrono sobre el pago de las pensiones. Ello, dado que el único vínculo obligacional presente en la controversia era estrictamente entre los pensionados y el Fideicomiso. Esa conclusión resulta contraria a nuestro mandato en Acevedo Feliciano, et al. v. Iglesia Católica, Apostólica y Romana, et al., supra. En aquella ocasión establecimos con claridad la relación

obligacional entre las partes y el efecto jurídico de la misma. Así, la actuación del Tribunal de Apelaciones resulta errónea, toda vez que es incongruente con nuestro mandato previo. Véase, Colón, *et al.* v. Frito Lays, 186 DPR 135, 151 (2012).

En esa ocasión, este Tribunal determinó que en el Plan existían varias cláusulas que responsabilizaban a los patronos con las obligaciones del Fideicomiso. Íd., págs. 9-10. A raíz de ello, ordenamos al Tribunal de Primera Instancia a que celebrara una vista, con tal de determinar cuáles patronos poseían personalidad jurídica independiente y serían los responsables por pagar. En ese sentido, expresamos lo siguiente:

> A la vez, e independientemente de la legalidad de la terminación del plan, del Plan de Pensiones surgen varias cláusulas que versan sobre la responsabilidad de los patronos participantes para con los beneficiarios, a saber: 1) el Artículo 2 (B), donde los patronos **garantizan** su contribución de los fondos necesarios para la operación del plan, 2) los Artículos 4 (B) y 8 (B.1) donde se enfatiza una garantía de pago de por lo menos sesenta (60) meses, 3) el Artículo 7 (E), donde se establece que los patronos que terminen su participación en el plan son responsables de amortizar el pasivo acumulado no financiado, y 4) el Artículo 15 (B), donde se enfatiza que el patrono que se retira del Plan es responsable de los **beneficios adquiridos** de sus empleados mientras participó. Todo esto requiere examinar la responsabilidad que incurrieron los patronos al pactar el Plan de Pensiones, y si ésta se extiende más allá de la figura del fideicomiso que establecieron. Acevedo Feliciano, *et al.* v. Iglesia Católica, Apostólica y Romana, *et al.*, supra, págs. 9-11 (escolios omitidos).

Por tal motivo, y por los fundamentos expuestos en nuestra Sentencia previa, la cual advino final y firme,

concluimos que el foro apelativo intermedio erró al actuar contrario a nuestro mandato. Ello, dado que en aquella ocasión ya este Tribunal concluyó que el vínculo obligacional entre las partes era existente según se desprendía de varias partes del Plan. Por tal razón, actuó correctamente el foro primario al ceñirse a lo dispuesto por este Tribunal en Acevedo Feliciano, *et al.* v. Iglesia Católica, Apostólica y Romana, *et al.*, supra, a los fines de celebrar una vista, para determinar cuál parte ostentaba personalidad jurídica para propósitos de cumplir con la obligación que ya este foro determinó existente.

**IV**

**A.**

El remedio de embargo en aseguramiento de sentencia busca asegurar la efectividad de la sentencia que en su día se dicte. Ramos, *et al.* v. Colón, *et al.*, 153 DPR 534 (2001). Por ello, las Reglas de Procedimiento Civil obligan a los tribunales a exigir la prestación de una fianza con tal de otorgar ese remedio. 32 LPRA Ap. V, R. 56.4. No obstante, existen varias excepciones a la prestación de esa fianza. En lo pertinente a la controversia presente, una de las excepciones dispone que "[u]n remedio provisional sin la prestación de fianza podrá concederse en cualquiera de los casos siguientes: (a) si aparece de documentos públicos o privados, según definidos por ley y firmados ante una persona autorizada para administrar juramento, que la obligación es legalmente exigible . . .". 32 LPRA Ap. V, R. 56.3. La

definición de lo que constituye un documento público o privado debe gozar de una interpretación amplia y expansiva. J.A. Cuevas Segarra, Tratado de Derecho Procesal Civil, 2da ed., San Juan, Pubs. JTS, 2011, T. V, pág. 1607. Por tal razón, la gama de documentos admisibles para eximir a una parte de tener que prestar fianza es sumamente amplia. A tales efectos, consta en el expediente abundante prueba documental que demuestra la exigibilidad de la obligación en cuestión, a saber: Manual informativo para patronos participantes, Apéndice del *certiorari*, págs. 564-566; Manual informativo para empleados, íd. págs. 567-569; Escritura de fideicomiso, íd. págs. 545-563; Plan de Pensiones de las Escuelas Católicas de la Arquidiócesis de San Juan, íd. págs. 516-538; Minuta de la reunión del Fideicomiso del 26 de abril de 2010, Íd. pág. 680, y Minuta de la reunión del Fideicomiso del 13 de septiembre de 2010, íd. pág. 690.

**B.**

De otra parte, el interdicto preliminar tiene como función "mantener el *status quo* mientras se dilucida el pleito". Mun. Fajardo v. Srio. Justicia, 187 DPR 245, 255 (2012). Para la concesión de este remedio la parte solicitante debe, además de cumplir con los criterios establecidos en la Regla 57.3 de las Reglas de Procedimiento Civil, 32 LPRA Ap. V, R. 57.3, prestar una fianza, como regla general. Según el Doctor Cuevas Segarra, "la imposición de una fianza previa constituye un requisito esencial que no

debe ceder ante ningún supuesto, **salvo circunstancias extraordinarias en donde requerir tal prestación conllevaría un fracaso de la justicia"**. (Énfasis suplido) Cuevas Segarra, op. cit., pág. 1726. De igual forma opina el Profesor Echevarría Vargas. J.A. Echevarría Vargas, Procedimiento civil puertorriqueño, San Juan, [ed. de autor], 2012, pág. 393. Ante ese cuadro, nos encontramos ante circunstancias excepcionales las cuales hacen imperativo reconocer en nuestro ordenamiento tal excepción. Por tanto, no podemos avalar el razonamiento del Tribunal de Apelaciones el cual nos conduciría a que no esté disponible para un peticionario la concesión de un remedio interdictal para evitar un fracaso de la justicia si no posee la fuerza del dinero. Esa lógica debilitaría la efectividad del Derecho en una sociedad democrática y cerraría las puertas a los tribunales por consideraciones puramente económicas a los que, precisamente, necesitan un remedio económico urgente.

A esos efectos, resulta claro que exigir la prestación de una fianza en este caso implicaría un fracaso a la justicia. Nos explicamos. Aquí, la parte peticionaria reclama el pago de una pensión que resulta incontrovertible que ha dejado de ser sufragada. Como consecuencia de ese incumplimiento, los peticionarios sufren un daño, a raíz de la falta de flujo de ingresos y las consecuencias claras y palpables que atentan contra su salud, seguridad y bienestar en una etapa de retiro. Así lo reconocimos y expusimos en la Sentencia de Acevedo Feliciano, *et al.* v. Iglesia Católica,

Apostólica y Romana, *et al.*, supra, págs. 8-9. Ante la realidad de que los peticionarios expusieron situaciones concretas y particularizadas de cómo la privación del pago de la pensión ha tenido un impacto significativo en sus vidas, resultaría un contrasentido jurídico exigir la prestación de una cuantiosa fianza para que los demandados continúen el pago de la pensión que los peticionarios reclaman.

**V**

Por los fundamentos que anteceden, se expide el recurso de *certiorari* y se revoca la sentencia del Tribunal de Apelaciones a los extremos abordados en esta Opinión. En consecuencia, se sostiene y se mantiene en todo vigor el dictamen contenido en la Resolución emitida por el Tribunal de Primera Instancia el 16 de marzo de 2018, al igual que todas las medidas adoptadas por el foro de instancia y, por tanto, se devuelve el caso a ese foro para la continuación de los procedimientos ulteriores, cónsono con lo pautado en esta Opinión.

Luis F. Estrella Martínez
Juez Asociado

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | | |
|---|---|---|
| Yalí Acevedo Feliciano, *et al.*<br><br>Peticionarios<br><br>v.<br><br>Iglesia Católica, Apostólica y Romana, *et al.*<br><br>Recurridos | CC-2018-0475 | *Certiorari* |
| Sonia Arroyo Velázquez, *et al.*<br><br>Peticionarios<br><br>v.<br><br>Iglesia Católica, Apostólica y Romana, *et al.*<br><br>Recurridos | | |
| Elsie Alvarado Rivera, *et al.*<br><br>Peticionarios<br><br>v.<br><br>Iglesia Católica, Apostólica y Romana, *et al.*<br><br>Recurridos | | |

SENTENCIA
(Regla 50)

San Juan, Puerto Rico, a 11 de junio de 2018.

Por los fundamentos que anteceden, se expide el recurso de *certiorari* y se revoca la sentencia del Tribunal de Apelaciones a los extremos abordados en esta Opinión. En consecuencia, se sostiene y se mantiene en todo vigor el dictamen contenido en la Resolución emitida por el Tribunal de Primera Instancia el 16 de marzo de 2018, al igual que todas las medidas adoptadas por el foro de instancia y, por tanto, se devuelve el caso a ese foro para la continuación de los procedimientos ulteriores, cónsono con lo pautado en esta Opinión.

Notifíquese **inmediatamente** por teléfono y por correo electrónico.

Así lo pronunció, manda el Tribunal y certifica el Secretario del Tribunal Supremo. La Juez Presidenta Interina señora Rodríguez Rodríguez y el Juez Asociado señor Colón Pérez disienten con opiniones escritas. La Jueza Presidenta Oronoz Rodríguez no intervino.


                          Juan Ernesto Dávila Rivera
                          Secretario del Tribunal Supremo

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Yalí Acevedo Feliciano *et al.*<br><br>Peticionarios<br><br>v.<br><br>Iglesia Católica, Apostólica<br>y Romana *et al.*<br><br>Peticionario<br><br>_____<br><br>Sonia Arroyo Velázquez, et<br>al.<br><br>Peticionarios<br><br>v.<br><br>Iglesia Católica, Apostólica<br>y Romana et al.<br><br>_____<br><br>Elsie Alvarado Rivera, *et al.*<br><br>v.<br><br>Iglesia Católica, Apostólica<br>y Romana *et al.* | **Núm.** <u>CC-2018-0475</u> |

Opinión disidente emitida por la Juez Asociada señora Rodríguez Rodríguez

San Juan, Puerto Rico, a 11 de junio de 2018.

> Una vez más, "con la iglesia hemos dado, Sancho".[6]

Por entender que el curso de acción adoptado por una Mayoría de los integrantes de este Tribunal violenta el

---

[6] *Diócesis De Arecibo v. Srio. Justicia*, 191 D.P.R. 292, 329 (2014) (Rodríguez Rodríguez, J., Op. Disidente) (citando a M. de Cervantes Saavedra, *Don Quijote de la Mancha*, (Ed. IV Centenario), Madrid, Ed. Alfaguara, 2004, en la pág. 60.

principio constitucional sobre separación de Iglesia y Estado consagrado tanto en la Constitución del Estado Libre Asociado de Puerto Rico como en la Constitución de los Estados Unidos de América, al reconfigurar - *de facto* y *de jure* - la organización eclesiástica interna y jerárquica de la Iglesia Católica, Apostólica y Romana, **disiento enérgicamente**.

## I.

La controversia medular ante nuestra consideración tuvo su origen luego de una *Sentencia* emitida por este Foro, el 18 de julio de 2017. *Véase Acevedo Feliciano, et al. v. Iglesia Católica, Apostólica y Romana, et al.*, res. 18 de julio de 2017, CC-2016-1053. La Sentencia que emitimos en ese momento revisó una *Resolución y Orden* del Tribunal de Primera Instancia que, a su vez, denegó una solicitud de interdicto preliminar y embargo en aseguramiento de sentencia presentada por los demandantes. El foro primario había concluido, como cuestión de derecho, que los daños alegados en la demanda eran económicos y por lo tanto reparables, por lo que no procedía el interdicto solicitado. El foro apelativo intermedio se negó a revisar ese dictamen.

Traído a nuestra consideración esa controversia, expedimos el auto y revocamos. Concluimos que los demandantes, beneficiarios de un Plan de Pensiones, habían sufrido un daño irreparable al verse "despojados de su necesitada fuente de ingreso." En vista de ello, se declaró *ha lugar* la demanda de interdicto preliminar presentada por Yalí Acevedo Feliciano y los demás maestros y maestras

demandantes (en conjunto, peticionarios). En virtud de ese dictamen, este Foro ordenó la continuación de los pagos de las pensiones reclamadas. De igual forma, se ordenó al foro primario celebrar una vista evidenciaria para determinar si las entidades demandadas tenían personalidad jurídica y, consiguientemente, eran responsables por el pago de las pensiones en cuestión mientras se dilucidaban los méritos del caso. *Véase Acevedo Feliciano, et al. v. Iglesia Católica, Apostólica y Romana, et al.*, res. 18 de julio de 2017, CC-2016-1053, en la pág. 13.

Acatando el mandato por parte de este Foro, el Tribunal de Primera Instancia celebró la vista correspondiente y, luego de considerar la evidencia presentada, los escritos sometidos por las partes y el derecho vigente, resolvió que "las iglesias-escuelas demandadas, así como la Arquidiócesis de San Juan y la Superintendencia de Escuelas Católicas de San Juan, no ostentan personalidad jurídica propia por formar parte de la Iglesia Católica, Apostólica y Romana, como ente con personalidad jurídica propia, así reconocido por nuestro estado de derecho actual". *Resolución del Tribunal de Primera Instancia* (Civil Núm. SJ-2016-CV-0131), 16 de marzo de 2018, en la pág. 8. Para arribar a dicha conclusión, el foro primario analizó, en esencia, el artículo 8, párrafo 2 del Tratado de París del 10 de diciembre de 1898 y las expresiones del Tribunal Supremo de los Estados Unidos en *Municipality of Ponce v. Catholic Church in Porto Rico*, 210 U.S. 296 (1908).

Según la interpretación del foro primario –suscrita hoy por una mayoría de este Tribunal– el Tribunal Supremo de los

Estados Unidos dictaminó que dicho artículo del Tratado presuntamente reconoció una personalidad jurídica propia e independiente a la Iglesia Católica, Apostólica y Romana (Iglesia Católica) en Puerto Rico. Por las razones que se exponen más adelante en este disenso, esa interpretación de la decisión emitida por el Tribunal Supremo federal carece de fundamentos jurídicos e históricos y es del todo incompatible con la doctrina constitucional moderna sobre la separación de Iglesia y Estado y el Código de Derecho Canónico.

A la luz de dicho análisis sobre la personalidad jurídica de la Iglesia Católica, el Tribunal de Primera Instancia ordenó que se continuara "con la emisión de pagos a los demandantes conforme al Plan de pensiones, mientras se dilucida este pleito". *Resolución del Tribunal de Primera Instancia* (Civil Núm. SJ-2016-CV-0131). Ante el incumplimiento de la Iglesia Católica, el 27 de marzo de 2018, el foro primario le ordenó, en un término de veinticuatro (24) horas, consignar la cantidad de $4,700,000 como medida para asegurar el pago de las pensiones de los demandantes. De igual forma, le apercibió que su incumplimiento resultaría en una orden de embargo de sus cuentas bancarias.

Insatisfecha, ese mismo día, la Iglesia Católica acudió al Tribunal de Apelaciones mediante *certiorari* y una moción de auxilio de jurisdicción. En respuesta a esta última, el foro apelativo intermedio ordenó preventivamente la paralización de los procedimientos ante el foro primario. Tras recibir los respectivos alegatos de las partes en el

pleito, el 30 de abril de 2018, el Tribunal de Apelaciones emitió una sentencia mediante la cual revocó en su totalidad la determinación del Tribunal de Primera Instancia.

En lo pertinente a la controversia sobre la personalidad jurídica de la Iglesia Católica, dicho foro razonó que, conforme al Derecho Canónico y al estado de Derecho vigente en torno a los principios de separación de Iglesia y Estado, "no existe en la Isla una estructura que agrupe bajo una sola autoridad a todas las diócesis y a la que sus obispos estén subordinados". *Sentencia del Tribunal de Apelaciones*, KLCE-2018-00413, 30 de abril de 2018, en la pág. 29. Al interpretar las secciones 368 y 369 del Código de Derecho Canónico, el foro apelativo intermedio enfatizó que una diócesis es una porción del pueblo de Dios, cuyo cuidado se le encomienda al Obispo y que, con la cooperación del presbiterio, "constituye una Iglesia particular, en la cual verdaderamente está presente y actúa la Iglesia de Cristo una santa, católica y apostólica". *Id.* en la pág. 30. Es decir, conforme al ordenamiento canónico, "la estructura jerárquica de la religión católica no cuenta con ninguna otra autoridad con capacidad de representar a toda la Iglesia Católica en Puerto Rico, que no sea el propio Obispo de Roma, como cabeza universal de la Iglesia, Católica, Apostólica y Romana". *Id.* en la pág. 31.

Cónsono con este pronunciamiento, el Tribunal de Apelaciones sostuvo que la decisión del Tribunal Supremo de los Estados Unidos en *Municipality of Ponce* debía interpretarse tomando en consideración la realidad y el contexto histórico de la época cuando se resolvió este caso.

Para el foro apelativo intermedio, en el momento en que se emitió la opinión en cuestión, en Puerto Rico sólo existía "una sola diócesis (la Diócesis de Puerto Rico), por lo que, en la práctica, existía entre la Iglesias Católica y la diócesis una misma identidad o conceptualización". *Id.* en la pág. 36. En fin, el Tribunal de Apelaciones resolvió que el Tribunal Supremo federal no hizo más que reconocer el derecho vigente antes de la cesión del territorio de Puerto Rico a los Estados Unidos y, de ninguna forma, esto se debería interpretar como el reconocimiento de una personalidad jurídica propia de la Iglesia Católica en Puerto Rico; pues, lo contrario, constituiría una forma de "intervenir en la estructura interna de la Iglesia [y] en su funcionamiento u organización". *Id.* en la pág. 37.

Así las cosas, el Tribunal de Apelaciones concluyó que la orden de embargo y el interdicto preliminar no procedían, puesto que estaban dirigidas a un ente inexistente. De otra parte, el foro apelativo intermedio resolvió que: (1) los patronos participantes del plan de retiro no estaban obligados a pagar individualmente la pensión que recibían sus empleados; (2) la orden de embargo y el interdicto preliminar no procedían dado que la parte peticionaria no había prestado la fianza correspondiente, y (3) la Academia del Perpetuo Socorro poseía personalidad jurídica propia por razón de haber renovado su certificado de incorporación en el 2017 y, por ende, se le debía reconocer dicha personalidad de forma retroactiva.[7]

---

[7] Debo mencionar que el Juez Rivera Colón emitió un voto disidente en el cual expresó estar **conforme** con la

Inconforme, el 14 de mayo de 2018, la Iglesia Católica presentó ante este Tribunal una *Moción en Auxilio de Jurisdicción y/o Trámite expedito* y una petición de *certiorari* mediante las cuales, en síntesis, solicitaban la paralización de los procedimientos y la revocación de la sentencia dictada por el Tribunal de Apelaciones. Aún sin disponer de estos recursos, el 21 de mayo de 2018, la representación legal del Fideicomiso Plan de Pensiones para Empleados de Escuelas Católicas (Fideicomiso) presentó una *Moción Informativa* ante este Foro en la cual planteó que la Academia del Perpetuo Socorro, el 18 de mayo de 2018, había incoado oportunamente una moción de reconsideración ante el foro apelativo intermedio. Así las cosas, una mayoría de los integrantes de este Tribunal ordenó a todas las partes en el presente pleito expresarse sobre la referida moción informativa; en particular, en torno a si el recurso ante nuestra consideración era prematuro. En horas de la tarde del 24 de mayo de 2018, en cumplimiento con nuestra orden, las partes comparecieron y expusieron sus argumentos sobre el asunto en cuestión.

Ese mismo día, y ya entrada la noche, una mayoría de los integrantes de este Tribunal consideró los escritos presentados y resolvió que la parte peticionaria no fue notificada conforme a derecho de la presentación de la moción

---

determinación de la mayoría de los integrantes del Panel en cuanto a que la Iglesia Católica no tenía personalidad jurídica independiente. Sin embargo, **disintió del dictamen** por entender, correctamente a mi juicio, que la sentencia mayoritaria entró a dilucidar, impropiamente, asuntos sobre los méritos del presente caso que **no estaban** ante su consideración y, por ende, se excedió en su función revisora.

de reconsideración ante el Tribunal de Apelaciones. De esta manera, sin más, se proveyó *no ha lugar* a las mociones de desestimación presentadas y, paso seguido, se paralizaron los procedimientos ante los foros recurridos. Esto tuvo el efecto de ordenar a la Iglesia Católica continuar la emisión de los pagos conforme al Plan de Pensiones y cumplir con lo dispuesto en las resoluciones y órdenes del Tribunal de Primera Instancia, dictadas los días 16 y 26 de marzo de 2018, respectivamente. Por último, se le concedió el brevísimo término de diez (10) días para que la Iglesia Católica y demás recurridos mostraran causa por la cual no se debía revocar la sentencia del foro apelativo intermedio.

El 1 de junio de 2018, la parte peticionaria presentó una *Urgente Moción de Desacato y Otros Extremos* mediante la cual solicitó que se declarara a la Iglesia Católica incursa en desacato, se ordenara la eliminación de sus alegaciones en el caso y se autorizara el diligenciamiento de la orden de embargo emitida por el foro primario. Aún sin disponer de dicha moción, el 4 de junio de 2018, las partes recurridas presentaron sus respetivas mociones en cumplimiento de orden.

Así las cosas, durante el día de hoy, una mayoría de los integrantes de este Foro emite una opinión, bajo el procedimiento expedito de la Regla 50 de nuestro Reglamento mediante la cual reorganiza inopinadamente la estructura interna de la Iglesia Católica en Puerto Rico. Al así proceder, da al traste con las protecciones constitucionales de la absoluta separación de Iglesia y Estado contenidas en la Constitución del Estado Libre Asociado de Puerto Rico y

en la Constitución de los Estados Unidos, según establecidas en su jurisprudencia interpretativa, respectivamente. Dado que este Tribunal se arrogó jurisdicción para atender el presente caso, tengo el deber ineludible de expresarme en torno a los méritos de la controversia principal planteada y lo equivocado que resulta el dictamen que hoy se suscribe.

## II.

Como cuestión de umbral, debo dejar muy claro que mi postura en esta Opinión Disidente de ninguna manera implica que estoy pasando juicio, o comprometiendo mi criterio, sobre **los méritos** del presente caso y la validez del reclamo de los maestros y maestras de las escuelas católicas en torno a la **legalidad** de la terminación del Plan de Retiro. En todo momento, las determinaciones de este Tribunal y los foros inferiores han surgido en el **contexto exclusivo** de una acción de interdicto preliminar y embargo en aseguramiento de sentencia. No albergo duda alguna, como sostuvo una mayoría de los integrantes de este Tribunal en la *Sentencia del 18 de julio de 2017*, que en esta **etapa temprana** de los procedimientos "la balanza de los intereses se inclina hacia las peticionarias". *Acevedo Feliciano, et al. v. Iglesia Católica, Apostólica y Romana, et al.*, res. 18 de julio de 2017, CC-2016-1053, en la pág. 12. Ciertamente, como ya resolvió este Tribunal y señalamos anteriormente, durante la vigencia del presente pleito los maestros y maestras "despojados de su necesitada fuente de ingreso [] han sufrido daños irreparables". *Id.* en las págs. 11-12. Ahora bien, la controversia que sí está ante la consideración de este

Tribunal, y que surge de nuestro dictamen previo, es **contra quién** es y será oponible el reclamo monetario millonario que solicitan los peticionarios. En la respuesta a esta interrogante estriba, precisamente, mi **diferencia irreconciliable** con la Mayoría.

Tomando esto como punta de lanza, procederé a delinear las razones por las cuales estimo que la Opinión mayoritaria se inmiscuye inadecuadamente en el funcionamiento de la Iglesia Católica al imponerle una personalidad jurídica que no ostenta en el ámbito del derecho privado. Asimismo, considero que la decisión que hoy emite una mayoría, en la práctica, podría acarrear la inejecutabilidad de la sentencia que, en su día, pudiese dar fin al reclamo de los peticionarios; reclamo que hoy se somete a un suspenso deplorable.

## A.

La Sección 3 del Artículo II de la Constitución del Estado Libre Asociado de Puerto Rico, L.P.R.A., Tomo 1, establece que, "[n]o se aprobará ley alguna relativa al establecimiento de cualquier religión ni se prohibirá el libre ejercicio de culto religioso. Habrá completa separación de la iglesia y el estado". De otra parte, la Constitución de los Estados Unidos dispone claramente que, "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition

the Government for a redress of grievances." U.S. Const. amend. I.

De entrada, resulta preciso destacar que nuestra cláusula constitucional –distinto a su contraparte federal- expresamente ordena "completa separación de la Iglesia y el Estado". A nivel federal, esa separación –cual aspiración e inspiración de las cláusulas religiosas- se ha formulado mediante un reconocimiento de la existencia de dos esferas de acción separadas que se remontan al pensamiento secular de Thomas Jefferson y James Madison.[8] Las otras dos cláusulas relacionadas con el reconocimiento de la libertad de culto y la prohibición al establecimiento de una religión contenidas en ambas constituciones previenen actuaciones del Estado que puedan tender a: (1) promover una religión particular o (2) limitar su ejercicio. De ahí que en el pasado este Tribunal haya reconocido que, tanto a nivel federal como a nivel estatal, existe una tensión entre ambas cláusulas que ha resultado en una amplia jurisprudencia que procura armonizar las mismas. *Véase Mercado, Quilichini v. U.C.P.R.*, 143 D.P.R. 610, 635 (1997)*; Diócesis De Arecibo v. Srio. Justicia*, 191 D.P.R. 292, 308 (2014)(sentencia)(*citando a* School *Dist. Of Abington Tp., Pa. v. Schempp*, 374 U.S. 203 (1963)).

En cuanto la cláusula sobre separación de Iglesia y Estado de nuestra Constitución, hemos afirmado que la misma

---

[8] *Véase* Laurence Tribe, *American Constitutional Law*, en la pág. 819 (Foundation Press 1979). Véase además, John Ragosta, "Federal Control: Jefferson's Vision in Our Times," *en Religious Freedom: Jefferson's Legacy, America's Creed* (Charlottesville: University of Virginia Press, 2013), en las págs. 185-86, 188; *Watson v. Jones*, 80 U.S. 679 (1871).

exige un reconocimiento de una jurisdicción para la Iglesia distinta y separada de la del Estado. Esto, en aras de que las actuaciones de ambos entes no interfieran entre sí. Véase *Mercado, Quilichini*, 143 D.P.R. en la pág. 634. Cónsono con ello, hemos determinado que el mandato constitucional de separación de Iglesia y Estado impide que los tribunales civiles pasemos juicio "sobre materias de doctrina, de disciplina, de fe o de **organización eclesiástica** interna". *Amador v. Conc. Igl. Univ. De Jesucristo*, 150 D.P.R. 571, 579-80 (2000)(énfasis suplido).

A lo largo de los años, las denominadas "cláusulas religiosas", tanto en el ámbito federal como en el ordenamiento jurídico puertorriqueño, han constituido la base para el desarrollo de normas y estándares adjudicativos que, a su vez, han servido de guía para atajar planteamientos en torno a la interrelación entre el Estado, la religión y la iglesia. En el presente caso, queda claro que la controversia no implica una posible violación a la libertad de culto, así como tampoco supone el favorecimiento de una religión por parte del Estado. Más bien, es la determinación de este Tribunal la que incide directamente en los principios que informan la organización, funcionamiento, jerarquía y estructura de la Iglesia Católica en Puerto Rico.

La opinión mayoritaria, al abordar este asunto, se enfoca en la naturaleza del reclamo de los demandantes, advirtiendo que "nos encontramos ante obligaciones civiles voluntariamente contraídas y no impuestas por el Estado".[9]

---

[9] Conviene distinguir, pues, entre la naturaleza sustantiva de la controversia ante nuestra consideración y los efectos

*Opinión*, en la pág. 10. Así, indica que lo resuelto en *Mercado, Quilichini* es dispositivo, en cuanto a la autoridad de los tribunales civiles para dilucidar disputas contractuales que "no requiera[n] pasar juicio sobre materias de doctrina de fe o de organización eclesiástica interna". *Id.* (*citando a Mercado, Quilichini v. U.C.P.R.*, 143 D.P.R. en la pág. 635 (1997)). Luego de indicar que este Foro se encuentra en la misma posición que en *Mercado, Quilichini* y mediante un análisis claramente deshilvanado, la Mayoría concluye que las otras entidades demandadas en el presente caso son "en realidad una fragmentación de un sólo ente poseedor de personalidad jurídica": la Iglesia Católica. *Opinión*, en las págs. 10-11.

En el contexto particular de la prohibición constitucional al establecimiento de una religión, en el caso *Lemon v. Kurtzman*, 403 U.S. 602 (1971) el Tribunal Supremo federal estableció un esquema tripartito de análisis para determinar si una legislación o práctica estatal constituye un establecimiento indebido de la religión. Ese esquema –conocido comúnmente como el *Lemon Test*– requiere

---

del dictamen que hoy suscribe una mayoría para resolverla. Si bien es cierto que estamos ante un reclamo de índole contractual, la determinación respecto **a quién es oponible** dicho reclamo, que para la Mayoría sería la Iglesia Católica, resulta en una clara violación a la cláusula de separación de Iglesia y Estado. En otras palabras, no estamos ante un caso en el que la controversia requiere evaluar si una actuación estatal violenta alguna de las cláusulas religiosas. Interesantemente, en este caso la actuación estatal se concreta en **la etapa de la resolución** de la controversia por parte de este Tribunal al atribuirle –por la vía judicial– personalidad jurídica a la Iglesia Católica en el ámbito del Derecho Privado. Ello, en contravención a las distintas disposiciones del Código de Derecho Canónico que rigen la estructura y la organización de esa entidad religiosa con carácter universal.

que los tribunales examinen: (1) si la legislación o actuación persigue un propósito secular, (2) si de alguna forma promueve o inhibe la religión, o (3) si constituye una intromisión excesiva del Estado en asuntos religiosos. *Lemon v. Kurtzman*, 403 U.S. 602, 612-13 (1971); *Asoc. Academias y Col. Cristianos v. E.L.A.*, 135 D.P.R. 150 (1994) (adoptando y aplicando el esquema); véase además *Diócesis De Arecibo v. Srio. Justicia*, 191 D.P.R. 292, 310 (2014) (sentencia).

El profesor Efrén Rivera Ramos, al discutir este esquema de análisis y su adopción y aplicación por este Foro, se hace eco de las expresiones de la ex jueza del Tribunal Supremo federal Sandra Day O'Connor y explica que, "el principio es que la actuación gubernamental no debe endosar la Religión, ni en su propósito ni en su efecto". Efrén Rivera Ramos, *Estado, Religión Y Derecho: Marco Jurídico*, 84 Rev. Jur. U.P.R. 537, 541 (2015). Para propósitos prácticos, éste concluye que el principio general enunciado en *Lemon* y su progenie incluye las siguientes exigencias:

> (1) [Q]ue el Estado no debe privilegiar a ninguna religión, ni debe privilegiar la Religión en general; (2) **que el Estado no debe inmiscuirse en los asuntos internos de la Religión**, y (3) que el Estado no debe permitir que la Religión se inmiscuya en los asuntos de gobierno, o encomendarle asuntos de Gobierno a alguna religión. *Id.* (énfasis suplido).

La segunda exigencia tiene su origen en decisiones del Tribunal Supremo federal mediante las cuales se reconoció una modalidad de la violación a la prohibición constitucional al establecimiento de una religión a través de una **actuación indebida** por parte de los tribunales civiles de justicia. A esto se le ha denominado en la jurisprudencia

federal y estatal estadounidense como el "church autonomy doctrine" que es, para todos los efectos, un corolario de la separación de Iglesia y Estado que encarna la Primera Enmienda federal.[10]

Como se adelantó, si bien en el pasado hemos reconocido matices de esta doctrina al interpretar las cláusulas religiosas de nuestra Constitución, particularmente el mandato de separación de Iglesia y Estado, hemos sido cautelosos en su aplicación y hemos evitado adoptarla de manera contundente. Véase *Amador v. Conc. Igl. Univ. De Jesucristo*, 150 D.P.R. 571, 579-80, (2000); *Mercado, Quilichini v. U.C.P.R.*, 143 D.P.R. 610, 635 (1997); *Díaz v. Colegio Nuestra Sra. del Pilar*, 123 D.P.R. 765 (1989); *Agostini Pascual v. Iglesia Católica*, 109 D.P.R. 172 (1979).

Ahora bien, el Tribunal Supremo de los Estados Unidos decidió una serie de casos en los años cincuenta, sesenta y setenta que delimitan los contornos del "church autonomy doctrine" y, hasta cierto punto, han servido de guía para este Tribunal al momento de dirimir controversias en las que se plantea una intromisión indebida del Estado en asuntos de la Iglesia. Véase *Jones v. Wolf*, 443 U.S. 595 (1979); *Serbian E. Orthodox Diocese for U. S. of Am. & Canada v. Milivojevich*, 426 U.S. 696, 708 (1976) ("The fallacy fatal to the judgment of the [state supreme court] is that it rests

---

[10] Para un examen detallado de esta doctrina, véase *Construction and Application of Church Autonomy Doctrine*, 123 A.L.R. 5th 385 (2004). Véase además Michael A. Helfand, *Religion's Footnote Four: Church Autonomy As Arbitration*, 97 Minn. L. Rev. 1891 (2013), para una discusión sobre dicha doctrina, su evolución y su relación con los demás estándares de adjudicación para las denominadas "cláusulas religiosas".

upon an impermissible rejection of the decisions of the highest ecclesiastical tribunals of this hierarchical church upon the issues in dispute, and impermissibly substitutes its own inquiry into church polity and resolutions based thereon of those disputes".); *Maryland & Virginia Eldership of the Churches of God v. Church of God of Sharpsburg, Inc.*, 396 U.S. 367, 369 (1970) (Brennan, J., Op. Concurrente)("To permit civil courts to probe deeply enough into the allocation of power within a church so as to decide where religious law places control over the use of church property would violate the First Amendment in much the same manner as civil determination of religious doctrine."); *Presbyterian Church in U.S. v. Mary Elizabeth Blue Hull Mem'l Presbyterian Church*, 393 U.S. 440 (1969); *Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church in N. Am.*, 344 U.S. 94, 116 (1952) ("[A] spirit of freedom for religious organizations, an independence from secular control or manipulation, in short, power to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine.").

De la gama de la jurisprudencia federal antes mencionada conviene enfatizar la decisión de *Presbyterian Church in U.S.*, mediante el cual se resolvió que:

> First Amendment values are **plainly jeopardized** when church property litigation is made to turn on the resolution by civil courts of controversies over religious doctrine and practice. If civil courts undertake to resolve such controversies in order to adjudicate the property dispute, **the hazards are ever present of inhibiting the free development of religious doctrine and of implicating secular interests in matters of purely ecclesiastical concern**. Because of these hazards, the First Amendment enjoins the employment of

> organs of government for essentially religious
> purposes, the Amendment therefore commands civil
> courts to decide church property disputes **without
> resolving underlying controversies over religious
> doctrine.** Hence, States, religious organizations,
> and individuals must structure relationships
> involving church property **so as not to require the
> civil courts to resolve ecclesiastical questions.**
> *Presbyterian Church in U.S. v. Mary Elizabeth Blue
> Hull Mem'l Presbyterian Church*, 393 U.S. 440, 449
> (1969)(citas omitidas)(énfasis suplido).[11]

Además de las decisiones del Tribunal Supremo federal, la "church autonomy doctrine" ha sido avalada y aplicada por las distintas cortes federales y estatales. *Véase, e.g. Se. Pennsylvania Synod of the Evangelical Lutheran Church in Am. v. Meena*, 19 A.3d 1191, 1196 (Pa. Commw. Ct. 2011) ("If the civil courts are to inquire into all these matters, the whole subject of the doctrinal theology, the usages and customs, the written laws, and fundamental organization of every religious denomination may, and must, be examined into with minuteness and care, for they would become, in almost every case, the criteria by which the validity of the ecclesiastical decree would be determined in the civil court."); *McKelvey v. Pierce*, 173 N.J. 26, 800 A.2d 840 (2002); *Bryce v. Episcopal Church in the Diocese of Colorado*, 289 F.3d 648 (10th Cir. 2002).

---

[11] Aunque esta decisión, y las demás antes citadas, surgen en el contexto particular de la capacidad de una institución religiosa para adquirir propiedad privada, la metodología adoptada por el Tribunal Supremo federal informa lo que entendemos debe disponer de la controversia en el presente caso. Y es que, en la decisión que hoy toma la Mayoría, se determina quién es la Iglesia al margen de lo que la propia Iglesia sostiene. De hecho, y como se discute más adelante, el efecto práctico de lo decidido por la Opinión mayoritaria supone una intromisión indebida, no sólo en la organización de la Iglesia, sino también en la capacidad adquisitiva y la titularidad sobre bienes inmuebles de distintas entidades que han sido despojadas de personalidad jurídica propia por este Tribunal y que figuran como codemandadas en este pleito.

Considero que conforme a la discusión que antecede, es mandatorio concluir que el dictamen de la mayoría viola el principio de separación de Iglesia y Estado al inmiscuirse en la definición misma de quién es la Iglesia Católica para efectos de determinar su personalidad jurídica. La Mayoría sustituye el criterio sobre este asunto de la propia Iglesia Católica, por el suyo. Ello, a mi juicio, en clara contravención del mandato de nuestra Constitución y la de los Estados Unidos.

Antes bien, y con el fin de suplementar el análisis tan exiguo e inconexo contenido en la Opinión mayoritaria sobre la cláusula de separación de Iglesia y Estado, considero prudente e intelectualmente sensato abordar los aspectos de la organización eclesiástica interna y jerárquica de la Iglesia Católica que se ven adversamente afectados por el proceder mayoritario. Para ello, resulta indispensable examinar aquellos preceptos del Código de Derecho Canónico, del Tratado de París y de los Concordatos de 1851 y 1859 que explican la jerarquía y *modus operandi* de la Iglesia Católica y, además, develan el trasfondo histórico y jurídico de dicha institución religiosa en Puerto Rico. Veamos.

**III.**

**A.**

El Derecho Canónico se concibe como la estructura jurídica de la Iglesia Católica y constituye el sistema de relaciones jurídicas que unen a los fieles y los sitúan dentro del cuerpo social de la Iglesia Católica. Véase en general Daniel Cenalmor y Jorge Miras, *El Derecho de la*

*Iglesia: Curso básico de Derecho canónico* (1ra ed., Pamplona, Ed. Eunasa, 2004). En este sentido, como bien señaló el Tribunal de Apelaciones, su fin inmediato es "establecer y garantizar el orden social justo en la Iglesia, ordenando y conduciendo a sus súbditos, a través de dicho orden a la consecución del bien común". *Sentencia del Tribunal de Apelaciones*, KLCE-2018-00413, 30 de abril de 2018, en la pág. 15 (*citando a* A. Bernández Cantón et al., *Derecho Canónico*, 2da ed., Pamplona, Ed. Eunasa, 1975, en las págs. 75-79.)

Para propósitos del presente caso, resulta imperativo señalar que, conforme al Código de Derecho Canónico (CDC), "[l]a Iglesia Católica y la Sede Apostólica son personas morales por la misma ordenación divina". CDC 113, sec. 1. Cónsono con esto, en el ordenamiento canónico "además de personas físicas, hay también personas jurídicas, que son sujetos en derecho canónico de las obligaciones y derechos congruentes con su propia índole". *Id.* en la sec. 2. Esto responde al hecho práctico de que "las corporaciones y fundaciones constituidas por la autoridad eclesiástica competente . . . dentro de los límites que se les señalan, cumplan **en nombre de la Iglesia . . .**". CDC 116, sec. 1.

Estas normas generales cobran mayor sentido cuando se analizan las disposiciones contenidas en el Libro II del Pueblo de Dios en torno a las iglesias particulares y sus agrupaciones. Adviértase que "[e]l concepto de Iglesia particular **no es canónico sino teológico.**" Javier Hervada, *Elementos de Derecho Constitucional Canónico* (Madrid 2014) en la pág. 274. Esta sección del CDC establece que las

iglesias particulares "en las cuales, y desde las cuales existe **la Iglesia católica una y única**, son principalmente las diócesis". CDC 368. En atención a ello, como bien señaló el Tribunal de Apelaciones, este ordenamiento expone que:

> La diócesis es una porción del pueblo de Dios, cuyo cuidado pastoral se encomienda al Obispo con la cooperación del presbiterio, de manera que, unida a su pastor y congregada por él en el Espíritu Santo mediante el Evangelio y la Eucaristía, constituya una Iglesia particular, en la cual verdaderamente está presente y actúa la Iglesia de Cristo **una santa, católica y apostólica**. CDC 369 (énfasis suplido).

Este principio se efectúa en su sentido más práctico porque aquella porción del pueblo de Dios que "constituye una diócesis u otra Iglesia particular debe quedar circunscrita dentro de un territorio determinado, de manera que comprenda a todos los fieles que habitan en él". CDC 373. Así, la erección de las iglesias particulares "[c]orresponde tan sólo a la suprema autoridad . . . las cuales una vez que han sido legítimamente erigidas, **gozan en virtud del derecho mismo de personalidad jurídica**". CDC 373. Las diócesis son los órganos de gobierno local cuya jurisdicción queda definida por virtud de su demarcación territorial. Fernando Della Rocca, *Canon Law,* sec. 88, en la pág. 198. Véase además CDC 515 sec. 3 ("La parroquia legítimamente erigida tiene personalidad jurídica en virtud del derecho mismo".); Jorge de Otaduy, *La personalidad civil de las entidades organizativas de la Iglesia (Referencia particular a la parroquia)*, IUS CANONICUM, XXIX, n. 58 (1989) en las págs. 503-526.

Los expertos en temas de Derecho Canónico explican la organización de la Iglesia Católica y de sus iglesias particulares, afirmando que éstas últimas, "en sí mismas **son Iglesias, porque, aun siendo particulares en ellas se hace presente la Iglesia Universal** con todos sus elementos esenciales". Cenalmor y Miras, supra, en la pág. 271 (énfasis suplido). Esta misteriosa implicación recíproca entre ambas queda ilustrada en la siguiente afirmación: "el todo no es, sin más, la suma de las partes, **ni las partes una unidad parcial**, simple resultado de la división del todo, sino que **el todo está a la vez, opera y existe en cada una de las partes**" *Id.* (citas omitidas) (énfasis suplido).

Este análisis cobra relevancia si se entiende que la Iglesia Católica tiene capacidad para adquirir, retener, administrar y enajenar bienes temporales. Comentan los académicos que, "[n]o existe un patrimonio eclesiástico único bajo la titularidad directa de la Iglesia Universal, sino multitud de patrimonios con diversos titulares y fines". *Id.* en la pág. 503. No obstante, para su administración "rigen unos principios generales que tienden a unificar en cierto modo todos los bienes eclesiásticos, ordenándoles al servicio de unos mismos fines, **bajo la autoridad suprema del Romano Pontífice** y con régimen jurídico común". *Id.* (énfasis suplido).

Para fines de la controversia ante nuestra consideración, esto quiere decir que la Iglesia Católica, como ente jurídico en sí, no existe propiamente al amparo del Derecho Canónico, excepto sólo bajo el entendimiento de la Iglesia Universal, que es el Pueblo de Dios, cuya

autoridad suprema en la tierra es el Obispo de Roma. Cuando hablamos de la Iglesia Católica en Puerto Rico no es más que una manera coloquial de referirse a la Iglesia Universal que existe en cada una de las demás jurisdicciones del mundo. A su vez, la Arquidiócesis de San Juan y las demás diócesis e iglesias parroquiales en Puerto Rico no son "la suma de las partes, ni las partes una unidad parcial" sino que son ese todo que "está a la vez, opera y existe en cada una de las partes". Cenalmor y Miras, supra, en la pág. 271. La definición de lo **que es, y no es** la Iglesia le corresponde hacerla en puridad a dicha institución y no a los tribunales civiles. No puede ser de otra forma; lo contrario sería pasar juicio sobre la organización eclesiástica interna y la jerarquía de la Iglesia Católica, en clara contravención de la total separación entre Iglesia y Estado. Véase *Presbyterian Church in U.S. v. Mary Elizabeth Blue Hull Mem'l Presbyterian Church*, 393 U.S. 440, 449 (1969). Desafortunadamente, la Opinión de la Mayoría obvia o ignora estos asuntos.

Esta conclusión resulta aún más contundente cuando se considera bajo la lupa de la llamada "situación especial" de personalidad jurídica de la Iglesia Católica en Puerto Rico, según el Tratado de París, los Concordatos de 1851 y 1859, el caso federal de *Municipality of Ponce* y los estudios de los académicos que han abordado la temática relacionada con la personalidad de la Iglesia. Veamos.

**B.**

El trasfondo histórico y jurídico de la Iglesia Católica en la Isla nos remonta a los tiempos del dominio del Imperio español.[12] Para fines de la presente controversia, el acuerdo que ilustra la relación entre la Iglesia Católica, España y Puerto Rico al momento de la invasión y eventual cesión del territorio puertorriqueño a los Estados Unidos es el Concordato de 1851 (Concordato) entre la Reina Isabel II y la Santa Sede, representada por el Sumo Pontífice, Pío IX.

En 1851, luego de arduas negociaciones, el Reino de España y la Santa Sede firmaron el Concordato para sistematizar sus relaciones, así como para regular la organización administrativa de la Iglesia Católica en todo el Reino de España. Ello fue necesario en virtud del deterioro que las relaciones entre Iglesia Católica y el Estado español habían sufrido durante las primeras décadas del siglo XIX y la franca desorganización administrativa de la Iglesia. Durante esa primera parte del siglo, el Estado español había despojado a la Iglesia Católica, "en la persona de su clero secular y de sus comunidades religiosas de varones y mujeres, de todos los bienes eclesiásticos", bien

---

[12] Como dato histórico, mediante la Bula *Romanus Pontifex* de 1511, promulgada por el Papa Julio II, se erigieron en el Nuevo Mundo las primeras tres diócesis. Éstas fueron: Santo Domingo, Concepción de la Vega, -ambas en La Española- y San Juan Bautista, que luego pasó a llamarse la Diócesis de Puerto Rico. No fue sino hasta 1924 cuando se erigió la segunda, la Diócesis de Ponce. En la segunda parte del siglo XX se erigieron tres diócesis: Arecibo en 1960, Caguas en 1964 y Mayagüez en 1976. La última se erigió en 2008, la Diócesis de Humacao. Véanse, Samuel Silva Gotay, *La Iglesia Católica de Puerto Rico, en el Proceso Político de Americanización, 1898-1930* (Publicaciones Gaviota 2012); Gerardo Alberto Hernández-Aponte, *La Iglesia Católica en Puerto Rico ante la invasión de Estados Unidos de América. Lucha, sobrevivencia y estabilización: (1898-1921)* (Rio Piedras 2013).

para convertirlos en bienes nacionales o para ingresar el importe de la venta de estos a las arcas del gobierno español. Juan R. Gelpí Barrios, *Personalidad jurídica de la Iglesia en Puerto Rico: Vigencia del Concordato español de 1851 a través del tratado de París*, 95 Rev. Esp. Der. Canónico 395, 408 (1977); Federico Suárez, Génesis del Concordato de 1851, http://dadun.unav.edu/handle/10171/13928. Véase además, Francisco Tomás y Valiente, *Manual de Historia del Derecho Español*, (Madrid 2012) en las págs. 411-414, 613-619. Esta realidad generó innumerables litigios y reclamaciones que intentaban revertir las acciones del Estado. El Concordato buscó zanjar dicha situación.

Del referido Concordato, y en lo que concierne la controversia ante nuestra consideración, los artículos 40 y 41 resultan de particular relevancia. En el primero de éstos se reconoce que los bienes y rentas enajenados a la Iglesia, y enumerados en artículos anteriores, "pertenecen en propiedad a la Iglesia, y en su nombre se disfrutarán y administrarán por el clero." Véase, https://www.uv.es/correa/troncal/concordato1851 Este artículo manifiesta "de manera concluyente la personalidad jurídica de la Iglesia que le faculta para reclamar todos los bienes que estaban en litigio al momento de pactarse, puesto que el Estado le reconoce propietaria de ellos, aclarando que todo usufructo y administración, ha de entenderse a nombre de la Iglesia". Gelpi, supra, en la pág. 409.

De otra parte, el artículo 41 declaraba lo siguiente:

Además, la Iglesia tendrá el derecho de adquirir por cualquier título legítimo, y su propiedad en todo lo que posee ahora o adquiera en adelante será solemnemente respetada. Por consiguiente, en cuanto a las antiguas y nuevas fundaciones eclesiásticas, no podrá hacerse ninguna supresión o unión sin la intervención de la autoridad de la Santa Sede, salvas las facultades que competen a los obispos, según el Santo Concilio de Trento.

Véase *https://www.uv.es/correa/troncal/concordato1851*

El profesor Gelpí Barrios, al analizar este artículo nos indica, con razón, que éste era muy importante dado que la Iglesia Católica tenía "de forma independiente en todos los dominios españoles, una personalidad civil reconocida y garantizada por el propio Estado, para adquirir, por cualquier título legítimo y poseer en todo tiempo, toda clase de bienes temporales". Gelpí, *supra*.

De hecho, en atención a lo dispuesto en el artículo precitado se redactó el artículo 38 del Código Civil español de 1889, vigente en Puerto Rico hasta al cambio de soberanía en 1998. Ese artículo disponía que:

Las personas jurídicas pueden adquirir y poseer bienes de todas clases, así como contraer obligaciones y ejercitar acciones civiles o criminales, conforme a las leyes y reglas de su constitución.
**La iglesia se regirá en este punto por lo concordado entre ambas potestades;** y los establecimientos de instrucción y beneficencia por lo que dispongan las leyes especiales. *Id.* (Énfasis suplido.)

Al incorporar el Código Civil el principio de personalidad jurídica de la Iglesia reconocido en el Concordato, el Estado español "convirtió los Concordatos entre la Iglesia y la Corona de España, en Ley civil, para los efectos de adquirir

y poseer bienes de todas clases, contraer obligaciones y ejercitar acciones civiles y criminales" *Id.*[13]

Luego del Concordato de 1851, las Cortes nacionales aprobaron la Ley del 4 de noviembre de 1859 mediante la cual se sancionó la Corona autorizando al Gobierno para concluir un convenio con la Santa Sede. Eso resultó en el Concordato de 1859 que, en unión con el Concordato de 1851, resultó en que "quedase totalmente consolidada la personalidad jurídica de la Iglesia y su derecho de propiedad sobre los bienes que adquiriese o le fueran restituidos". Gelpí Barrios, *supra*, en la pág. 410.

El ordenamiento jurídico reseñado en los párrafos que anteceden era aquel vigente al momento de la Guerra Hispanoamericana que culminó con el Tratado de París del 10 de diciembre de 1898 (Tratado) y la cesión de Puerto Rico a los Estados Unidos. Es decir, tanto los Concordatos de 1851 y 1859, como las enmiendas al Código Civil español tuvieron vigencia durante el periodo restante de la soberanía española en la Isla. Ahora bien, el Tratado incorporó y reconoció ciertos aspectos del estado de Derecho español vigente al momento del cambio de soberanía. En lo pertinente

---

[13] Debo mencionar -como dato curioso- que la Memoria explicativa que acompañó el Concordato de 1851 reseñó que la reorganización de los entes eclesiásticos que formó parte del texto del Concordato no incluye a "las Iglesias de América, ya porque la desorganización introducida en las Iglesias de la Península apenas ha alcanzado allí, ya también porque todo lo que afecta [a] aquellos lejanos países **debe tratarse de una manera especial**". Juan Pérez Alhama, *La Iglesia y el Estado español: Estudio histórico-jurídico a través del Concordato de 1851*, (Instituto de Estudios Políticos, Madrid 1967), Apéndice, en la pág. 526 (énfasis suplido).

a la controversia ante nuestra consideración, el Tratado

declaró que:

> Queda por lo tanto declarado que esta renuncia o
> cesión, según el caso, a que se refiere el párrafo
> anterior, en nada puede mermar la propiedad, o los
> derechos que corresponden, con arreglo a las
> leyes, al poseedor pacífico de los bienes de todas
> clases de las provincias, municipios,
> establecimientos públicos o privados,
> **corporaciones civiles o eclesiásticas o de
> cualesquiera otras colectividades que tienen
> personalidad jurídica para adquirir y poseer
> bienes en los mencionados territorios renunciados
> o cedidos, y los de los individuos particulares**,
> **cualquiera que sea su nacionalidad.** Tratado de Paz
> entre Estados Unidos de América y el Reina de
> España, Art. 8, 10 de diciembre de 1989, EE. UU.-
> España, 30 Stat. 1754 (1898), T.S. 343 (énfasis
> suplido).

Como se mencionó, el Tribunal Supremo de los Estados

Unidos interpretó este artículo del Tratado en *Municipality*

*of Ponce v. Catholic Church in Porto Rico*, 210 U.S. 296

(1908). Dada la importancia de ese dictamen, estimo

necesario reproducir en su totalidad ciertas secciones de

dicha opinión para proceder con un análisis completo de su

alcance. Justo luego de citar el artículo 8 del Tratado, el

foro federal razonó que:

> This clause is manifestly intended to
> guard the property of the church against
> interference with, or spoliation by, the new
> master, either directly or through his local
> governmental agents. There can be **no question
> that the ecclesiastical body referred to, so
> far as Porto Rico was concerned, could only
> be the Roman Catholic Church in that island,
> for no other ecclesiastical body there
> existed.** *Id.* en la pág. 311.

De igual forma, el Tribunal Supremo de los Estados Unidos

interpretó los Concordatos de 1851 y 1859 y el

"reconocimiento corporativo" por parte del gobierno

estadounidense de la Iglesia Católica, incluyendo su Sumo Pontífice,[14] y resolvió que:

> The Roman Catholic Church has been recognized as possessing legal personality by the treaty of Paris, and its property rights solemnly safeguarded. In so doing the treaty has **merely followed** the recognized **rule of international law** which would have protected the property of the church in Porto Rico subsequent to the cession. This **juristic personality** and the church's ownership of property **had been recognized** in the most formal way by the concordats between Spain and the papacy, and **by the Spanish laws** from the beginning of settlements in the Indies. Such recognition has also been accorded the church **by all systems of European law** from the fourth century of the Christian era. *Id.* en las págs. 323-24

De entrada, no se puede perder de perspectiva que todo el análisis del foro federal se da en el contexto del Derecho Internacional Público. Sus expresiones al hacer referencia a la "existencia corporativa" de la Iglesia Católica surge específicamente con relación al reconocimiento del Sumo Pontífice y la Santa Sede. Es decir, estas expresiones no se pueden interpretar como un "reconocimiento especial" de personalidad jurídica **en sí** por tratarse de la Iglesia Católica en Puerto Rico, sino más bien como un reconocimiento de la peculiaridad de ésta y de cómo no se trataba de una entidad incorporada propiamente conforme a las leyes de Derecho Corporativo vigentes en los Estados Unidos para aquella época.

---

[14] "The **corporate existence** of the Roman Catholic Church, as well as the position occupied by the **papacy**, have always been recognized by the government of the United States. . . . The **Holy See still occupies a recognized position in international law**, of which the courts must take judicial notice." *Id.* en la pág. 318 (énfasis suplido).

La mención explícita del Derecho Internacional Público, las leyes del Reino de España y todos los demás sistemas legales en Europa para validar la "personalidad jurídica" de la Iglesia Católica, razonablemente sólo puede implicar que ésta se refiere a un solo ente religioso a nivel mundial: la Iglesia Universal del pueblo de Dios.  Precisamente, el profesor José Julián Álvarez en su tratado de derecho constitucional apunta que una de las consecuencias de la Opinión del Tribunal Supremo federal fue "que la Iglesia Católica nunca tuviera la necesidad de incorporarse, como debieron hacer otras entidades religiosas."  José Julián Álvarez González, *Derecho Constitucional Puertorriqueño* (2009) en la pág. 1192.

Las investigaciones realizadas por el profesor Gelpí Barrios, las cuales ya se han citado extensamente, apoyan esta explicación y se alejan de la **interpretación acomodaticia** de la Opinión mayoritaria que **ni tan siquiera cita directamente** este trabajo que, curiosamente, sirvió como fundamento principal para su errada conclusión en torno a tan importante controversia. Luego de analizar el trasfondo histórico, jurídico y social que llevaron a los Concordatos de 1851 y 1859 y el Tratado de París, el profesor Gelpí Barrios explica que:

> Al tiempo de la cesión, solamente había en Puerto Rico **una diócesis. En la actualidad existen cinco:** la archidiócesis de San Juan y las diócesis de Ponce, Arecibo, Caguas y Mayagüez. Cada diócesis es una fragmentación de un solo ente poseedor de personalidad jurídica. Cada una de ellas goza del **mismo *status* legal correspondiente a la diócesis original de Puerto Rico,** es decir, a la Iglesia católica romana de Puerto Rico.
> Ninguna de ellas ha nacido gracias al acto de incorporación tal y como lo exige el Derecho de

Puerto Rico, sino, por **la acción de la Santa Sede**, que tiene efectos legales civiles desde el momento en que el documento de erección de la nueva jurisdicción territorial es ejecutada por la autoridad competente. Gelpí Barrios, *supra*, en la pág. 410 (énfasis suplido).

Vale reconocer que estas expresiones del Profesor son una traducción al español de un artículo publicado por el fenecido Obispo de Ponce, Fremiot Torres Oliver, el 28 de mayo de 1976, titulado *Juridical Personality of the Roman Catholic Churchs in Puerto Rico*, 15 Rev. Der. P.R. 307 (1975)("Each diocese is a fragmentation of one entity possessing juristic personality, and each enjoys the same legal status as the original Diocese of Puerto Rico, referred to in the above quoted opinion as "The Roman Catholic Church in Puerto Rico".") *Véase además* Aníbal Colón Rosado, *Relations Between Church and State in Puerto Rico*, 23 Rev. Der. P.R. 53 (1983). Si algo se puede concluir de estas expresiones, que son más que una interpretación -no vinculante- de un académico y Obispo sobre el caso de *Municipality of Ponce* y la historia de nuestro antiguo pasado colonial español, es que la organización interna y jerárquica de la Iglesia Católica ha cambiado en Puerto Rico desde que esta isla caribeña pasó a pertenecer a los Estados Unidos. Valga destacar también, que en 1903 "la Diócesis de Puerto Rico [se separó] de la Provincia Eclesiástica de Santiago de Cuba, y [se] constituyó en diócesis sujeta directamente a la Santa Sede, lo cual dio a Puerto Rico, dentro del derecho eclesiástico, plena independencia eclesiástica, como cualquier otro país latinoamericano." Samuel Silva Gotay, *La Iglesia Católica de Puerto Rico, en*

*el Proceso Político de Americanización, 1898-1930,* (Publicaciones Gaviota 2012) en las págs. 184-185. Ello colocó a la Iglesia Católica puertorriqueña "en pie de igualdad con las iglesias de Norte, Centro y Sur América . . . ." *Id.* en la pág. 185.

La llamada "fragmentación" de la Diócesis de Puerto Rico no puede interpretarse como una rotura de la personalidad jurídica de la Iglesia Universal del pueblo de Dios, como parece sostener la Mayoría. Más que nada, de lo que se trata es de la fundación de nuevas diócesis como vehículo que posibilita hacer "más eficiente el trabajo pastoral". *Id.* en la pág. 282. Es decir, para llevar a cabo la labor de evangelización. Nuevamente, la conclusión en contrario de la Opinión mayoritaria es claramente errónea.

La Iglesia Católica "opera y existe" en la Arquidiócesis de San Juan y las restantes cinco (5) diócesis. Cenalmor y Miras, *supra*, en la pág. 271. Con lo cual, cada uno de estos entes son en sí la Iglesia Católica y no las partes de una unidad parcial que forman una sola entidad como concluye la Mayoría. Cada comunidad diocesana tiene atribuida la "riqueza mistérica" de la Iglesia Católica. *Id.* Resolver como propone la Mayoría, una vez más, violentaría la separación entre Iglesia y Estado por inmiscuirse este Tribunal en **la definición y conceptualización** de dicha religión. La mayoría nos está decidiendo "quién es" la Iglesia Católica Apostólica y Romana, determinación que, como hemos visto, sólo compete a la Iglesia Católica misma y no al Estado a través de este Foro. Véase, *Maryland &*

*Virginia Eldership of the Churches of God, supra*, en la pág. 369. Lo cierto es que las instituciones **dentro** de la Iglesia Católica en Puerto Rico que poseen personalidad jurídica son la **Arquidiócesis de San Juan y las cinco (5) diócesis.** Además, en lo que atañe la reclamación en el presente pleito, no se puede perder de vista que algunos de los patronos demandados, como por ejemplo la Academia del Perpetuo Socorro, ostentan personalidad jurídica propia e independiente en el ámbito del Derecho Privado al haberse incorporado conforme a las exigencias del Derecho Corporativo y el Departamento de Estado.[15]

**IV.**

A pesar de entender que el análisis que antecede es suficiente para despejar toda duda sobre el desatino del proceder mayoritario, considero necesario examinar, si bien brevemente, las implicaciones prácticas de la determinación de la mayoría y las consecuencias de imponerle a una entidad

---

[15] La Opinión de la mayoría no atiende este asunto, al limitarse a indicar que el certificado de incorporación de esa institución había sido revocado en el 2014. Confusamente, posteriormente en la Opinión se contempla, -haciendo referencia específica a la Academia del Perpetuo Socorro- la posibilidad de que algunas entidades se sometan a un proceso ordinario de incorporación. En cuanto a esto, resulta importante señalar que el Departamento de Estado restableció la incorporación de la Academia del Perpetuo Socorro y, en consecuencia, su personalidad jurídica se retrotrajo a la fecha de su incorporación original. *Véase Carlos Díaz Olivo*, *Corporaciones* (Publicaciones Puertorriqueñas, 1999) en la pág. 43. Además de esta inadvertencia por parte de la mayoría, algunas de las instituciones educativas que se mencionan en la Opinión ni siquiera figuran como parte en este pleito. Específicamente, a lo largo de la Opinión se alude al "Colegio San Ignacio", cuando la parte demandada es la "Academia San Ignacio", una institución educativa completamente distinta.

religiosa una personalidad jurídica que no ostenta y que, para propósitos de su organización interna, es inexistente.

En primer lugar, conviene llamar la atención al hecho de que la Opinión mayoritaria **revoca de manera tácita** años de jurisprudencia establecida por este Tribunal, mediante la cual la Arquidiócesis de San Juan y demás cinco (5) diócesis han figurado como partes en distintos litigios. Si consideramos una de las primeras decisiones de este Foro en la cual la Diócesis de Puerto Rico formó parte, se desprende que, hasta hoy, la personalidad y el estatus jurídico de esa institución había sido reconocido por este Foro. En *Iglesia Católica Apostólica Romana v. El Pueblo*, 11 D.P.R. 485 (1906), este Tribunal atendió una demanda en la cual la Iglesia Católica solicitaba que el Gobierno de la Isla le devolviese unos bienes de las Comunidades Religiosas de Frailes Dominicos y Franciscanos que habían sido suprimidos e incautados en 1838. En el pleito, el Gobierno de Puerto Rico cuestionó la potestad de la Iglesia Católica para adquirir propiedad. En este contexto, este Tribunal atendió el asunto de la capacidad legal del Obispo para instar la demanda en cuestión y, en lo pertinente, expuso que:

> Otro tanto es de decirse respecto [a] la personalidad del Obispo Católico de Puerto Rico para llevar la representación de la Iglesia Católica en el presente litigio. **Los obispos llevan la representación de la iglesia en sus respectivas Diócesis con arreglo [a] los cánones de la Iglesia Católica** y esta representación les [fue] especialmente reconocida por los concordatos en todo cuanto se refería [a] la entrega de los bienes [a] los Obispos y [a] su permutación en la forma acordada entre ambas potestades. Iglesia Católica Apostólica Romana, 11 D.P.R. en la pág. 10 (énfasis suplido).

Ciertamente, estas expresiones son consistentes con la interpretación del caso *Municipality of Ponce* y el análisis expuesto en los acápites II y III de esta opinión. Luego de esta decisión, en diversas ocasiones, este Tribunal ha atendido controversias por vía de las cuales le ha reconocido personalidad jurídica a la Arquidiócesis de San Juan y las cinco (5) otras Diócesis. Esto, demostrando un entendimiento sobre la organización eclesiástica interna y jerárquica de la Iglesia Universal de pueblo de Cristo. Véase *Diócesis de Arecibo v. Srio. De J*usticia, 191 D.P.R. 292 (2014); *Diócesis de Mayagüez v. Junta de Planificación*, 147 D.P.R. 471 (1999); *Díaz v. Colegio Nuestra Sra. Del Pilar*, 123 D.P.R. 765 (1989); *Academia San Jorge v. Junta de Relaciones de Trabajo*, 110 D.P.R. 193 (1980); *Agostini Pascual v. Iglesia Católica, Diócesis de Ponce*, 109 D.P.R. 172 (1979); *Vélez Colón v. Iglesia Católica, Apostólica y Romana, Diócesis de Arecibo*, 105 D.P.R. 123 (1976); *Camacho v. Iglesia Católica, Apostólica y Romana, Diócesis de San Juan v. Registrador*, 95 D.P.R. 511 (1968); *Iglesia Católica, Apostólica y Romana Diócesis de Ponce*, 72 D.P.R. 353 (1951). Como se anticipó, avalar la Opinión mayoritaria conlleva a dar por **no puestas** todas estas decisiones.

Además, los efectos prácticos de la decisión que hoy emite una mayoría ponen en manifiesto la liviandad y simpleza del análisis empleado y se perfilan como un obstáculo adicional en la resolución final del presente pleito y, consiguientemente, el cobro por parte de los demandantes de las cuantías que reclama. En esencia, el dictamen suscrito, al atribuirle improcedentemente personalidad jurídica a la

Iglesia Católica, despoja de personalidad jurídica independiente a las otras entidades demandadas y, consecuentemente, releva a éstas del cumplimiento con las obligaciones que asumieron en torno a los demandantes y que son el objeto de este pleito. A esos efectos, nótese que la orden de embargo decretada, según contenida en la Resolución que hoy una mayoría "sostiene y mantiene en todo vigor" dispone lo siguiente:

> Se ordena, en virtud de ello, al alguacil de este Tribunal que proceda a embargar bienes y dineros de la Santa Iglesia Católica Apostólica y Romana en una cantidad de $4,700,000 para responder por el pago de las pensiones de los demandantes, incluyendo bonos, valores, vehículos de motor, obras de arte, equipos, muebles, cuentas, bienes inmuebles y cualquier otro bien perteneciente a la Santa Iglesia Católica Apostólica y Romana, y cualquiera de sus dependencias, que esté ubicado en Puerto Rico

Resulta insostenible concebir que dicha orden sea, en efecto, ejecutable. ¿Cómo han de identificarse los bienes a ser embargados? ¿Importa su titularidad? ¿Hay algún orden de prelación entre tanta generalidad? ¿Qué ocurre con las otras entidades demandadas? ¿Carecen de personalidad jurídica a pesar de estar incorporadas? ¿Procede la desestimación de las causas de acción incoadas en su contra? ¿Qué ocurrirá con los bienes de las diócesis que han solicitado intervención en este pleito y al día de hoy no son parte? ¿Serán despojadas de éstos sin un debido proceso de ley? ¿Son embargables todos los bienes de otras entidades religiosas, tal y como égidas, centros de cuido y otras instituciones educativas?

Las interrogantes son muchas y la falta de respuestas evidencia que el dictamen suscrito por una mayoría de los integrantes de este Foro carece de profundidad, seriedad y el rigor intelectual que una controversia de tan alto interés público amerita. Por todo lo cual, dejaría sin efecto el embargo decretado al ser éste inejecutable y estar dirigido a una entidad que carece de personalidad jurídica propia y, para todos los efectos, no existe en Derecho.


                              Anabelle Rodríguez Rodríguez
                                Juez Presidenta Interina

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | | |
|---|---|---|
| Yalí Acevedo Feliciano y Otros<br><br>     Peticionarios<br><br>          vs.<br><br>Iglesia Católica Apostólica y<br>Romana y Otros<br><br>     Recurridos<br>_____<br>Sonia Arroyo Velázquez y Otros<br><br>     Peticionarios<br><br>          vs.<br><br>Iglesia Católica Apostólica y<br>Romana y Otros<br><br>     Recurridos<br>_____<br>Elsie Alvarado Rivera y Otros<br><br>     Peticionarios<br><br>          vs.<br><br>Iglesia Católica Apostólica y<br>Romana y Otros<br><br>     Recurridos | CC-2018-475 | Certiorari |

Opinión disidente emitida por el Juez Asociado SEÑOR COLÓN PÉREZ.

En San Juan, Puerto Rico a 11 de junio de 2018.

***Omnes viae Roman ducunt.***

Hay algunos que dicen que *"todos los caminos conducen a Roma"*; histórica expresión atribuible al sistema eficiente de

calzadas romanas que existía en tiempos de los emperadores, y que le garantizaba, al que siguiera su ruta, el acceso a la capital de uno de los mayores imperios que el mundo ha conocido: Roma. Y es precisamente allí, a Roma, sede de la *Iglesia Católica, Apostólica y Romana* donde una mayoría de este Tribunal -- **a través de un dictamen que, como mínimo, será muy difícil de ejecutar** -- ha enviado a un grupo de maestros y maestras de diversos colegios católicos del país a reclamar su derecho a un retiro digno, del cual ellos y ellas aparentan ser merecedores. Por no estar de acuerdo con este lamentable proceder, que valida un litigio mal llevado, y que -- al final del día -- dejará desprovista de remedios a la clase magisterial que hoy toca nuestra puerta, enérgicamente disentimos.

En esa dirección, no validaremos con nuestro voto un dictamen en extremo superficial, carente de un análisis profundo sobre las diversas dimensiones de las controversias ante nuestra consideración, en el cual una mayoría de este Tribunal, dejando a un lado todos los precedentes que atienden temas similares al que hoy nos ocupa, opta por reconocerle personalidad jurídica a un concepto abstracto y de carácter universal como lo es el término *Iglesia Católica, Apostólica y Romana*. Al así hacerlo, los compañeros Jueces y Juezas que forman parte de la mayoría obvian en su análisis que la *Iglesia Católica, Apostólica y Romana*, por su función, propósito e idiosincrasia requiere estar presente en todos los rincones del globo terráqueo. Su misión, como la de toda iglesia, es expandirse en todos los lugares del mundo que se le permita. De ahí, la complejidad que resulta

poder determinar quiénes, en controversias como las que hoy nos ocupan, y que ocurren en nuestra jurisdicción, son los llamados a responder.

Por ello, en el presente caso -- previo a emitir cualquier tipo de dictamen -- era necesario estudiar con detenimiento la estructura organizacional de la Iglesia Católica, de forma tal que se pudiese determinar, con particular precisión, cuáles de sus entidades verdaderamente tienen personalidad jurídica y, en consecuencia, quiénes son aquellas partes verdaderamente llamadas a responder al grupo de maestros y maestras que incoó la causa de epígrafe. Ya que una mayoría de este Tribunal no realizó el mencionado estudio -- **y toda vez que estamos ante un litigio que posee todos los elementos necesarios para ser revisado por el Tribunal Supremo de los Estados Unidos** -- a través de esta Opinión Disidente, procedemos a así hacerlo. Corresponde ahora que el Alto Foro Judicial Federal, si así lo solicitan las partes aquí afectadas, rectifique el error cometido por este Tribunal, por tratarse de un asunto de particular importancia en el tema de la separación de Iglesia y Estado. Veamos.

I.

Los hechos medulares no están en controversia. El 6 de junio de 2016, sesenta y seis (66) maestros y maestras de la Academia del Perpetuo Socorro (en adelante, "maestros y maestras demandantes") presentaron una demanda de interdicto preliminar y permanente, sentencia declaratoria, incumplimiento de contrato, y daños y perjuicios en contra de la *Iglesia Católica,*

*Apostólica y Romana* de Puerto Rico, la Arquidiócesis de San Juan, la Superintendencia de Escuelas Católicas de San Juan, la Academia del Perpetuo Socorro y el Fideicomiso para el Plan de Pensiones para Empleados de Escuelas Católicas (en adelante, "Fideicomiso"). Ello, porque el referido Fideicomiso anunció el cese del plan de pensiones del cual éstos y éstas por años se beneficiaban.

Posteriormente, otro grupo de maestros y maestras de la Academia San José y la Academia San Ignacio de Loyola presentaron demandas análogas. Junto con la demanda, los mencionados empleados también solicitaron un interdicto preliminar y un embargo en aseguramiento de sentencia. En particular, alegaron que la paralización de los pagos les causó un daño irreparable contra sus derechos adquiridos y solicitaron al Tribunal que ordenara la continuación de la prestación de la pensión y el embargo de haberes de la *Iglesia Católica, Apostólica y Romana* hasta la suma de $4,444,419.95, ello para asegurar la sentencia que, en su día, pudiese estar emitiendo el foro primario. Mediante *Resolución* del 15 de julio de 2016, el Tribunal de Primera Instancia consolidó este caso con el originalmente presentado por la Academia del Perpetuo Socorro.

Así las cosas, examinados los planteamientos de todas las partes, el Tribunal de Primera Instancia denegó otorgar el interdicto preliminar solicitado. Dicha determinación fue confirmada por el Tribunal de Apelaciones, lo que motivó que la mencionada controversia culminara ante nuestra consideración. En aquella ocasión, mediante Sentencia de 18 de julio de 2017,

este Foro resolvió que procedía la solicitud de interdicto preliminar presentada por los maestros y maestras demandantes. Así pues, le ordenamos al Tribunal de Primera Instancia la celebración de una vista para determinar quién o quiénes estaban obligados a continuar el pago de las pensiones objeto de este litigio. Para ello, el foro primario debía dilucidar quiénes de los demandados tenían personalidad jurídica.

En virtud de la orden emitida por este Foro, las partes presentaron varios escritos ante el Tribunal de Primera Instancia. Los maestros y maestras demandantes alegaron que la Academia del Perpetuo Socorro, la Academia San José y la Academia San Ignacio de Loyola carecían de personalidad jurídica por ser dependencias de la Arquidiócesis de San Juan, quien también carecía de personalidad jurídica. Esto último, porque la Arquidiócesis de San Juan es una subdivisión de la *Iglesia Católica, Apostólica y Romana* quien es la única institución con personalidad jurídica.

Por su parte, la Academia del Perpetuo Socorro indicó que tenía personalidad jurídica por estar inscrita como corporación sin fines de lucro.[16] El Fideicomiso, la Arquidiócesis de San Juan y la Superintendencia de Escuelas Católicas de San Juan, aunque presentaron varios escritos al Tribunal, en esa etapa de los procedimientos, no se expresaron sobre el aspecto de personalidad jurídica.

---

[16] Además, señaló que su certificado de incorporación fue revocado por el Departamento de Estado el 4 de mayo de 2014. No obstante, se reinstaló su incorporación y se retrotrajo su personalidad jurídica a la fecha de incorporación original, el 2 de febrero de 1968.

En su escrito, el Fideicomiso informó que había presentado una petición de quiebras ante la Corte de Quiebras para el Distrito de Puerto Rico. La Arquidiócesis de San Juan y la Superintendencia de Escuelas Católicas de San Juan, por otro lado, presentaron una moción ante el foro primario en la que informaron sobre la presentación de una petición de traslado (*notice of removal*) en la Corte de Distrito de los Estados Unidos para el Distrito de Puerto Rico. Ello, por considerar que la reclamación objeto del presente litigio estaba relacionada a la petición de quiebra presentada por el Fideicomiso.

Así pues, examinados los escritos presentados por las partes, el Tribunal de Primera Instancia dictó *Sentencia Parcial*. En ésta, en vista de la petición de quiebra presentada ante la Corte de Quiebras para el Distrito de Puerto Rico, ordenó la paralización de los procedimientos en el presente caso y el archivo administrativo del mismo sin perjuicio. Sin embargo, posteriormente la Corte de Quiebras para el Distrito de Puerto Rico desestimó la petición de quiebra.

Enterados de ello, el 16 de marzo de 2018, la Arquidiócesis de San Juan y la Superintendencia de Escuelas Católicas de San Juan presentaron, ante la Corte de Distrito de los Estados Unidos para el Distrito de Puerto Rico, un aviso de desistimiento de su petición de traslado y, en consecuencia, solicitaron que el caso se devolviera al foro estatal. Dicho escrito fue notificado a todas las partes en el pleito.

Acto seguido, el 19 de marzo de 2018 los maestros y maestras demandantes presentaron ante el Tribunal de Primera Instancia una moción informativa en la cual notificaron a dicho foro que la Arquidiócesis de San Juan y la Superintendencia de Escuelas Católicas de San Juan presentaron ante el mencionado ente federal un aviso de desistimiento de la petición de traslado. Ese mismo día, el Tribunal de Primera Instancia emitió una Orden mediante la cual dejó sin efecto la paralización del pleito por razón de la petición de quiebra.

Posteriormente, en cumplimiento con la orden emitida por este Foro, el Tribunal de Primera Instancia celebró una vista evidenciaria para determinar si la *Iglesia Católica, Apostólica y Romana*, la Arquidiócesis de San Juan, la Superintendencia de Escuelas Católicas de San Juan, la Academia del Perpetuo Socorro, la Academia San José y la Academia San Ignacio de Loyola tenían personalidad jurídica. Celebrada la referida vista evidenciaria, el foro primario emitió una *Resolución* mediante la cual determinó que la Arquidiócesis de San Juan, la Superintendencia de Escuelas Católicas de San Juan y los mencionados Colegios, carecían de personalidad jurídica. Ello pues, las mismas son dependencias de la *Iglesia Católica, Apostólica y Romana*, que cuenta con personalidad jurídica en virtud del Tratado de París. Así, ordenó a la *Iglesia Católica, Apostólica y Romana* el pago de la pensión a los empleados demandantes, conforme al Plan de Pensiones, mientras se resolvía el presente litigio.

Inconformes con la referida determinación, la Arquidiócesis de San Juan y la Superintendencia de Escuelas Católicas de San Juan presentaron, ante el foro primario, una *Moción sobre nulidad de Resolución y solicitud para que se considere moción de desestimación por falta de jurisdicción*. En la misma, argumentaron que la referida *Resolución* se emitió sin jurisdicción, pues la Corte de Distrito de los Estados Unidos para el Distrito de Puerto Rico no había emitido una orden devolviendo el caso al Tribunal de Primera Instancia. El foro primario declaró *no ha lugar* la referida moción de desestimación.

Insatisfechas aún, la Arquidiócesis de San Juan y la Superintendencia de Escuelas Católicas de San Juan presentaron una moción de reconsideración y una moción para que se fijara la fianza conforme a los dispuesto por la Regla 56.3 de Procedimiento Civil, 32 LPRA Ap. V. R. 56.3. En oposición, los maestros y maestras demandantes alegaron que, mediante sus acciones, y al presentar una moción dispositiva el 13 de febrero de 2018, la *Iglesia Católica, Apostólica y Romana* renunció voluntariamente a la solicitud de traslado. Asimismo, solicitaron que se prohibiera a la *Iglesia Católica, Apostólica y Romana*, a la Academia del Perpetuo Socorro, a la Academia San José y a la Academia San Ignacio de Loyola comparecer de forma separada por ser dependencias de la *Iglesia Católica, Apostólica y Romana*. Por último, requirieron que se ordenara la consignación de los fondos restantes del Fideicomiso.

Vistos los referidos documentos, el Tribunal de Primera Instancia emitió una *Resolución* mediante la cual ordenó a *la Iglesia Católica, Apostólica y Romana* a consignar, en un plazo de veinticuatro (24) horas, la suma de $4,700,000 en el Tribunal. Además, advirtió a la *Iglesia Católica, Apostólica y Romana* que, de incumplir con la referida orden, procedería a embargar sus cuentas bancarias.

Oportunamente, y en desacuerdo con las referidas *Resoluciones* emitidas por el foro primario, la Arquidiócesis de San Juan acudió al Tribunal de Apelaciones mediante una *Moción en auxilio de jurisdicción* y petición de *certiorari*. En su recurso, la Arquidiócesis de San Juan alegó que el Tribunal de Primera Instancia erró: (1) al emitir una *Resolución* cuándo carecía de jurisdicción para hacerlo por, en ese momento, estar pendiente una solicitud de traslado a la Corte de Distrito de los Estados Unidos para el Distrito de Puerto Rico; (2) al no desestimar la demanda al amparo del *Foreign Sovereign Immunities Act* por falta de jurisdicción sobre la materia; (3) al no desestimar la demanda por falta de jurisdicción sobre la persona de la *Iglesia Católica, Apostólica y Romana*; (4) al emitir un *interdicto* preliminar sin imponer una fianza al amparo de la Regla 57.4 de Procedimiento Civil, 32 LPRA Ap. V, R. 57.4; (5) al resolver que la Arquidiócesis de San Juan no tenía personalidad jurídica independiente de la *Iglesia Católica, Apostólica y Romana*; (6) al determinar que la Academia del Perpetuo Socorro tenía personalidad jurídica; y, (7) al ordenar la consignación de 4.7 millones de dólares, que equivale un

interdicto permanente, sin la celebración de vista y/o la presentación de prueba sobre las cantidades.

Estudiados los alegatos de todas las partes, el Tribunal de Apelaciones dictó Sentencia. Al así hacerlo, resolvió, en primer lugar, que aunque se había presentado una moción de traslado a la Corte de Distrito de los Estados Unidos para el Distrito de Puerto Rico, la que posteriormente fue desestimada, al momento en que el Tribunal de Primera Instancia emitió la *Resolución* objeto de revisión, la conducta desplegada por la Arquidiócesis de San Juan y la Superintendencia de las Escuelas Católicas de San Juan, quienes solicitaron el traslado, reflejan que estos renunciaron al remedio del traslado al foro federal. Por lo tanto, a juicio del Tribunal de Apelaciones, el foro primario no carecía de jurisdicción para emitir la *Resolución* en controversia.

En cuanto al reclamo sobre falta de jurisdicción sobre la materia, el foro apelativo intermedio determinó que no procedía el mismo, pues era evidente que la demanda instada por los maestros y maestras demandantes estaba dirigida a la *Iglesia Católica, Apostólica y Romana* por acciones alegadamente incurridas por la misma en Puerto Rico.

Establecido lo anterior, al amparo del Tratado de París y el Código de Derecho Canónico, el Tribunal de Apelaciones determinó que la *Iglesia Católica, Apostólica y Romana* carecía de personalidad jurídica. No obstante, dicho foro sostuvo que, dentro de la estructura organizacional de la Iglesia, las diócesis, las parroquias, las órdenes religiosas, entre otras

organizaciones, sí tenían personalidad jurídica. El Tribunal de Apelaciones sentenció que ello, en parte, se debía a que en Puerto Rico no existía una estructura mayor que agrupase bajo una sola autoridad a todas las diócesis. Cada diócesis representaba, de manera autónoma, a la *Iglesia Católica, Apostólica y Romana* en su respectiva circunscripción.

De otra parte, sobre la Arquidiócesis de San Juan el Tribunal de Apelaciones determinó que, al igual que todas las diócesis en Puerto Rico, ésta tenía personalidad jurídica. Ello, pues el nivel de autoridad de una Arquidiócesis es el mismo que el de cualquier diócesis. La diferencia estriba, según ilustra el foro apelativo intermedio, en que una Arquidiócesis es denominada de tal forma por ser una diócesis de gran tamaño y población.

En cuanto a la Academia del Perpetuo Socorro, el Tribunal de Apelaciones razonó que se trataba de un colegio adscrito a la Parroquia Nuestra Señora del Perpetuo Socorro por lo que estaba cubierta por la personalidad jurídica de la Parroquia. Ello era así, a pesar de que la Academia del Perpetuo Socorro estaba registrada como corporación sin fines de lucro, al amparo del Art. 9.08 de la Ley de Corporaciones, 14 LPRA sec. 3708.

Asimismo, el foro apelativo intermedio determinó que la Academia San José, al ser una escuela parroquial, estaba adscrita a la Parroquia San José, por lo que quedaba cubierta bajo la personalidad jurídica de la referida Parroquia.

Ahora bien, en cuanto a la Academia San Ignacio de Loyola, el Tribunal de Apelaciones determinó que era una escuela

adscrita a la Orden de la Compañía de Jesús en Puerto Rico, Inc., mejor conocida como la Orden Jesuita. Esta última tenía personalidad jurídica conforme a lo dispuesto por el Tratado de París, por lo que, a juicio del Tribunal de Apelaciones, la referida Academia estaba cubierta por la personalidad jurídica de la Orden de la Compañía de Jesús en Puerto Rico, Inc.

Por otro lado, en cuanto al remedio concedido en virtud de la Regla 57.4 de Procedimiento Civil, *supra,* el interdicto preliminar y el derecho de obligaciones y contratos, el foro apelativo intermedio razonó que la obligación de los patronos -- entiéndase la Arquidiócesis de San Juan, la Superintendencia de Escuelas Católicas de San Juan, la Academia del Perpetuo Socorro, la Academia San José y la Academia San Ignacio de Loyola -- se implantó bajo la figura del Fideicomiso. Siendo ello así, no se les puede imputar a éstos -- mediante el remedio provisional del interdicto preliminar -- el pago de la pensión directamente a los demandantes. El remedio sólo procedía contra quien el derecho le asignaba esa obligación. Así pues, el Tribunal de Apelaciones determinó que lo que procedía era obligar a los patronos participantes a continuar haciendo las aportaciones a las que se comprometieron, en virtud del contrato del Plan de Pensiones. A juicio del foro apelativo intermedio, dichas sumas de dinero deberían ser consignadas en el tribunal, ante el estado de insolvencia del Fideicomiso. De ese fondo, se

podrían continuar haciendo los pagos a los maestros y maestras demandantes, por concepto de su pensión de retiro.[17]

Por último, en cuanto a la imposición de fianza conforme a los dispuesto por la Regla 56.3 de Procedimiento Civil, *supra*, el Tribunal de Apelaciones determinó que el Tribunal de Primera Instancia aplicó incorrectamente la referida Regla. El foro apelativo intermedio razonó que la excepción dispuesta por el inciso (c) de la Regla 56.3 de Procedimiento Civil, *supra,* es de aplicación al conceder un remedio en aseguramiento de sentencia, no al conceder un interdicto preliminar, y el mismo sólo procedía una vez emitida una sentencia final. Por considerarse la referida *Resolución* un dictamen interlocutorio, en palabras del foro apelativo intermedio, la autorización del remedio extraordinario sin prestación de fianza fue incorrecta.

No conforme con la determinación del Tribunal de Apelaciones, el 14 de mayo de 2018 los maestros y maestras demandantes, beneficiaros del Plan de Pensiones, recurrieron ante nos mediante *Moción en auxilio de jurisdicción y/o solicitud de trámite expedito* y petición de *certiorari*. En dichos escritos, en esencia, alegaron que el foro apelativo intermedio erró al revocar el dictamen del Tribunal de Primera Instancia. En particular, adujeron que el Tribunal de Apelaciones erró al resolver que la *Iglesia Católica Apostólica*

---

[17] En el caso particular de la Academia San Ignacio de Loyola y la Academia San José, al no tener personalidad jurídica individual, sino por medio de sus parroquias, no se les puede imponer la obligación de cumplir con el remedio provisional. Dicha obligación, residiría sobre la Parroquia San José y la Orden de la Compañía de Jesús en Puerto Rico, Inc., pero estos no han sido traídos al pleito. Estos son partes indispensables sin los cuales no se puede emitir un remedio para los reclamantes.

*y Romana* no tenía personalidad jurídica; al modificar el remedio provisional en aseguramiento de sentencia; y al dejar sin efecto la concesión del remedio sin prestación de fianza.

No obstante, el 22 de mayo de 2018, compareció ante nos el Fideicomiso mediante moción informativa en la que nos indicó que la Academia del Perpetuo Socorro había presentado una oportuna moción de reconsideración ante el Tribunal de Apelaciones el 18 de mayo de 2018, entiéndase cuatro (4) días después de presentada la *Moción en auxilio de jurisdicción y/o solicitud de trámite expedito* ante esta Curia, la cual privaba de jurisdicción a este Tribunal para atender la causa de epígrafe. Examinado dicho escrito, este Tribunal le concedió a todas las partes en el litigio un (1) día para que se expresaran sobre la referida moción informativa, en específico sobre si procedía o no desestimar el recurso ante nuestra consideración por ser prematuro.

Recibidas las comparecencias de todas las partes, una mayoría de este Tribunal determinó que la notificación de la referida moción de reconsideración a los beneficiarios del Plan de Pensiones fue una incorrecta por haberse enviado la misma a una dirección de correo electrónico de los abogados de los maestros y maestras demandantes distinta a la dispuesta en el Registro Único de Abogados y Abogadas del Tribunal Supremo, por lo que se dio por no puesta la misma. Así pues, se declaró *ha lugar la Moción en auxilio de jurisdiccion y/o solicitando tramite expedito* y petición de *certiorari*, y se le concedió a los recurridos un término de diez (10) días para mostrar causa

por la que este Tribunal no debía revocar la sentencia emitida por el Tribunal de Apelaciones.[18]

Cumpliendo con lo ordenado, todas las partes comparecieron ante nos. Con el beneficio de las referidas comparecencias, una mayoría de este Tribunal -- de forma errada y atropellada -- revoca la sentencia emitida por el foro apelativo intermedio y resuelve que la *Iglesia Católica, Apostólica y Romana* tiene personalidad jurídica y, por ende, es la llamada a responderle a la clase magisterial que hoy acude ante nos. De ese lamentable proceder, como mencionamos anteriormente, disentimos. Nos explicamos.

II.

**A. Jurisdicción**

---

[18] De dicho curso de acción disentimos y consignamos las siguientes expresiones:

> El Juez Asociado señor Colón Pérez disiente del curso de acción seguido por una Mayoría de este Tribunal en el presente caso, y se reitera en que, en estricto derecho, procede desestimar, sin más, la causa de epígrafe. Ello pues, éste es de la opinión que, de manera análoga a lo resuelto por este Tribunal en *Municipio de Rincón v. Velázquez Muñiz*, 192 DPR 989 (2015), debemos otorgarle deferencia al foro apelativo intermedio para que examine y resuelva la moción de reconsideración que tiene en estos momentos ante su consideración, la cual fue oportunamente presentada por la Academia del Perpetuo Socorro Inc., una de las partes en el litigio. **Ello incluye, entre otras cosas, el determinar si la referida moción de reconsideración fue presentada y notificada adecuadamente a todas las partes envueltas en el caso de marras.**
>
> A su juicio, la mera presentación de una moción en auxilio de jurisdicción ante este Foro, **la cual no ha sido atendida**, no priva de jurisdicción al Tribunal de Apelaciones para atender una moción de reconsideración que ha sido presentada en tiempo, y, en consecuencia, de pasar juicio sobre la corrección de la misma, así como de su dictamen previo. Como cuestión de hecho, el 22 de mayo de 2018, el foro apelativo intermedio -- entendiendo sobre la moción de reconsideración en cuestión -- ordenó a las partes expresarse en torno a la misma.

A dichas expresiones, se nos unió la compañera Juez Asociada señora Rodríguez Rodríguez.

Como es sabido, la jurisdicción es la autoridad que tiene un tribunal para adjudicar los casos y controversias ante su consideración. Véase, Regla 3.1 de Procedimiento Civil, 32 LPRA Ap. V., R. 3.1. Es norma reiterada que los tribunales debemos ser celosos guardianes del ejercicio de nuestra jurisdicción y que, para poder ejercitar válidamente dicha autoridad, debemos poseer jurisdicción sobre la materia y sobre las personas involucradas en el litigio. *Oficina de Asuntos Monopolísticos del Departamento de Justicia v. Jiménez Galarza,* 2017 TSPR 194, DPR (2017); *Medina Garay v. Medina Garay,* 161 DPR 806, 817 (2004); *Shuler v. Shuler*, 157 DPR 707, 718 (2002). **Un dictamen sin jurisdicción sobre la persona o sobre la materia es nulo.** *Constructora Estelar*, *S.E. v. Aut. Edif. Pub.*, 183 DPR 1, 22-23 (2011); *Vázquez v. López*, 160 DPR 714 (2003); *Bco. Santander PR v. Fajardo Farms Corp.,* 141 DPR 237, 244 (1996); *Vázquez v. ARPE*, 128 DPR 513, 537 (1991).

Así pues, cuestionada su jurisdicción, es deber ministerial de todo tribunal el examinar y evaluar con rigurosidad el señalamiento, pues éste incide directamente sobre el poder mismo para adjudicar una controversia. En esa dirección, conviene recordar aquí que los tribunales no tienen discreción para asumir jurisdicción allí donde no la hay. *Véase*, *Virella v. Proc. Esp. Rel. Fam.,* 154 DPR 742, 759 (2001); *Maldonado v. Pichardo,* 104 DPR 778, 782 (1976); *Martínez v.* Junta de Planificación, 109 DPR 839, 842 (1980).

Sobre este particular, en reiteradas ocasiones hemos señalado que, como regla general, un tribunal tiene jurisdicción

sobre toda persona que se encuentre domiciliada dentro de límites geográficos de Puerto Rico. 32 LPRA Ap. V, R. 3.1. Ahora bien, hemos reconocido, como excepción a la referida norma, que los tribunales pueden tener jurisdicción sobre personas ausentes dentro de sus límites territoriales si voluntariamente se someten a su jurisdicción mediante un acto sustancial que lo integre al pleito o si éste tiene contactos mínimos con el foro. *Shuler v. Shuler, supra,* pág. 719; *Qume Caribe, Inc. v. Srio. de Hacienda*, 153 DPR 700, 711 (2001); *Márquez v. Barreto*, 143 DPR 137, 143 (1997).

Como se sabe, el mecanismo para adquirir jurisdicción sobre la parte demandada es el emplazamiento. Este mecanismo, dispuesto por la Regla 4 de Procedimiento Civil, 32 LPRA Ap. V, R. 4, es el vehículo procesal mediante el cual el Tribunal adquiere jurisdicción sobre la persona, pues a través del mismo se le notifica a la parte demandada del inicio de un procedimiento judicial en su contra. *Torres Zayas v. Montano Gómez*, 2017 TSPR 202, ___ DPR ___, (2017); *Rivera Báez v. Jaume*, 157 DPR 562, 575 (2002); *Medina Garay v. Medina Garay, supra*, pág. 818. La falta de diligenciamiento del emplazamiento, conforme a lo dispuesto por la Regla 4 de Procedimiento Civil, *supra,* -- ya sea personalmente o por edicto -- priva al Tribunal de jurisdicción sobre la parte demandada. *Rivera Hernández v. Comtec Comm.*, 171 DPR 695, 714 (2007); *Medina Garay v. Medina Garay, supra, pág.* 818. De ahí, la necesidad de cumplir estrictamente con todos los requisitos del emplazamiento dispuestos por la referida Regla, pues es así, y solo así, que

el tribunal podrá adquirir jurisdicción sobre las partes en el pleito. *Quiñones Román v. CIA ABC,* 152 DPR 367, 374 (2000); *Chase Manhattan Bank v. Polanco Martínez*, 131 DPR 530, 535 (1992); *Medina Garay v. Medina Garay, supra*, pág. 819.

**B. Las partes**

Como hemos indicado en ocasiones anteriores, el concepto *parte* va enlazado al de *jurisdicción sobre la persona.* Cónsono con ello, hemos sentenciado que la parte demandante se somete voluntariamente a la jurisdicción del tribunal con la presentación de la demanda y la parte demandada se trae al tribunal mediante un correcto emplazamiento. *Sánchez Rivera v. Malavé* Rivera, 192 DPR 854, 872-873 (2015); Acosta *v. ABC, Inc.,* 142 DPR 927 (1997); *Rivera v. Jaume, supra,* pág. 575.

Ahora bien, además de lo antes dicho, para que un pleito pueda tramitarse adecuadamente, ambos, la parte demandante y la parte demandada, deben tener capacidad jurídica. Este concepto comprende la **capacidad de obrar** y la **personalidad jurídica**. *Véase* R. Hernández Colón*, Practica Jurídica de Puerto Rico: Derecho Procesal Civil,* 6ta ed., San Juan, LexisNexis de Puerto Rico, 2017, sec. 1101, pág. 144.

La capacidad de obrar es la facultad de una persona para gobernar los derechos y las obligaciones de los que es titular. *Alvareztorre Muñiz v. Sorani Jiménez,* 175 DPR 398, 418 (2009); *Asoc. de Res. Est. Cidra v. Future Dev.,* 152 DPR 54, 67 (2000); *Laureano Pérez v. Soto*, 141 DPR 77, 89 (1996). Así pues, una

persona que carece de capacidad de obrar no tiene la capacidad para comparecer en un juicio. *Íd.*

De otra parte, la personalidad jurídica es la capacidad para ser sujeto de derechos y obligaciones. *Alvareztorre Muñiz v. Sorani Jiménez, supra, pág. 418; Asoc. de Res Est. Cidra v. Future, supra,* en la pág. 66; *Laureano Pérez v. Soto, supra,* pág. 89. Al respecto, en el pasado hemos sentenciado que, la capacidad para ser parte de un pleito es una manifestación de la personalidad jurídica. *Alvareztorre Muñiz v. Sorani Jiménez, supra, pág. 418; Asoc. de Res Est. Cidra v. Future, supra,* en la pág. 66; *Laureano Pérez v. Soto, supra,* pág. 89.

En el caso de las corporaciones sitas en nuestro país, conviene recordar aquí que nuestro ordenamiento legal le reconoce personalidad jurídica en virtud de los dispuesto en la Ley General de Corporaciones de Puerto Rico, 14 LPRA sec. 3501 *et seq.* Sobre el particular, el Art. 29 del Código Civil establece que "la capacidad civil de las corporaciones, compañías y asociaciones, se regulará por las leyes que las hayan reconocido o creado". 31 LPRA sec. 103. Dicho reconocimiento de personalidad jurídica les permite a estas entidades "adquirir y poseer bienes de todas clases, así como contraer obligaciones y ejercitar acciones civiles o criminales, conforme a las leyes y reglas de su constitución". 31 LPRA sec. 104.

Por último, y en lo relacionado a las corporaciones u organizaciones sin fines de lucro, es menester señalar que una vez estas son reconocidas como tal, mediante la expedición de

su certificado de incorporación, las mismas también gozan de personalidad jurídica y, entre otras cosas, pueden demandar y ser demandadas. 14 LPRA sec. 3505. Una vez incorporada la organización sin fines de lucro, los socios o accionistas no responden en su carácter personal por actos de la misma.

**C. Partes Indispensables**

Establecido lo anterior, resulta necesario añadir a nuestro análisis aquellas expresiones de este Tribunal que, en virtud de la protección constitucional que impide que persona alguna sea privada de su propiedad o de su libertad sin un debido proceso de ley, le exigen a todo demandante, al momento de entablar cualquier pleito judicial, el incluir en el mismo a todas las partes que pudiesen verse afectadas por el dictamen que, en su día, pudiese emitir el foro judicial. *Bonilla Ramos v. Dávila Medina,* 185 DPR 667 (2012); *Sánchez v. Sánchez*, 154 DPR 645 (2001); *Cepeda Torres v. García Ortiz,* 132 DPR 698 (1993).

Cónsono con lo anterior, la Regla 16.1 de Procedimiento Civil requiere que, "las personas que tengan un interés común sin cuya presencia no pueda adjudicarse la controversia, se [hagan] partes y se [acumulen] como demandantes o demandadas, según corresponda. Cuando una persona que deba unirse como demandante rehúse hacerlo, podrá unirse como demandada". 32 LPRA Ap. V., R. 16.1.

**En ese sentido, como ya señalamos, se considera parte indispensable en un pleito aquella de la que no se puede**

**prescindir, puesto que la adjudicación sin su presencia supondría que las cuestiones litigiosas no puedan resolverse correctamente, pues sus derechos serían afectados.** *López García v. López García*, 2018 TSPR 57, ___ DPR ___ (2018); *Deliz et als. v. Igartúa et als.*, 158 DPR 403, 432 (2003); *Cepeda Torres v. García Ortiz*, 132 DPR 698, 704 (1993). Es decir, "el tercero ausente [tiene] un interés en el pleito que convierte su presencia en un requisito indispensable para impartir justicia completa o de tal orden que impida la confección de un decreto sin afectarlo". Hernández Colón, *op. cit.*, pág. 166. Dicho interés no se trata de cualquier interés en el pleito, sino que tiene que ser uno real e inmediato, de tal naturaleza que, sin su presencia, impida la confección de un remedio adecuado. *López García v. López García, supra*; *Romero v. S.L.G.*, 164 DPR 721, 733 (2005). *Pérez v. Morales Rosado,* 172 DPR 216, 223 (2007); *Véase*, además, J.A. Cuevas Segarra, *Tratado de Derecho Procesal Civil,* San Juan, Pubs. J.T.S. 2011, T. II, pág. 691; Hernández Colón, *op. cit.*, pág. 166.

Ahora bien, la determinación de si procede o no la acumulación de una parte indispensable depende de las circunstancias particulares que se presenten en cada caso. *Romero v. S.L.G., supra,* pág. 732. Consecuentemente, el tribunal debe hacer un análisis cuidadoso de distintos factores como el tiempo, lugar, modo, alegaciones, prueba, clase de derechos, intereses en conflicto, resultado y formalidad. Cuevas Segarra, *op. cit.,* pág. 695.

**Por último, es menester recordar que, la falta de parte indispensable constituye una defensa irrenunciable que puede presentarse en cualquier momento durante el proceso. Incluso, los foros apelativos, pueden y deben levantar** *motu proprio* **la falta de parte indispensable en un pleito, ya que ésta afecta la jurisdicción del tribunal**. *García Colón v. Sucn. González,* 178 DPR 527 (2010); *López García v. López García, supra; Romero v. S.L.G., supra.* **Por tal razón, la sentencia que se emita en ausencia de parte indispensable es nula.** *López García v. López García, supra; García Colón v. Sucn. González, supra, pág. 550; Unisys Puerto Rico, Inc. v. Ramallo Bros. Printing, Inc.,* 128 DPR 842, 859 (1991).

Dicho ello, corresponde examinar si realmente la *Iglesia Católica, Apostólica y Romana* es un ente con personalidad jurídica, y, en consecuencia, si es o no parte en el presente caso. Procedemos a así hacerlo.

**D. La Iglesia Católica, Apostólica y Romana**

1.

Como se sabe, la *Iglesia Católica, Apostólica y Romana* es católica porque es universal, se extiende por todo el mundo y es apostólica porque es misionera, "anuncia el Evangelio a todos los hombres y todas las mujeres". *Véase*, Papa Francisco, Audiencia General del miércoles, 17 de septiembre de 2014.[19] "La Iglesia no tiene cierres, es enviada a todo el mundo, a toda la

---

[19]Papa Francisco, Audiencia General del miércoles, 17 de septiembre de 2014, https://w2.vatican.va/content/francesco/es/audiences/2014/documents/papa-francesco_20140917_udienza-generale.html (última visita, 6 de junio de 2018).

humanidad." *Íd.* En virtud de su universalidad, ha sido propagada a todos los rincones del globo terráqueo, incluyendo a Puerto Rico.

En nuestro caso, la *Iglesia Católica, Apostólica y Romana*, Diócesis de Puerto Rico, se creó allá para el 1511, mediante la Bula *Romanus Pontifex* en la que se autorizó a fundar tres diócesis en las colonias españolas de aquel momento, entre ellas la de Puerto Rico. E. D. Dussel, *Historia general de la Iglesia en América Latina*, CEHILA Ed., 1995, T. IV, pág. 43. Según la historia, y como consecuencia del crecimiento poblacional que se dio a finales de siglo, ya para el siglo XVIII la Diócesis de Puerto Rico habría sufrido diversos cambios. José Manuel García Leduc, *¡La Pesada Carga! Iglesia, Clero y Sociedad en Puerto Rico (S. XIX) Aspectos de su Historia*, Ed. Puerto, 2009. Dichos cambios tuvieron efectos significativos sobre la configuración de la Iglesia, mas no requirieron el que se erigiera una nueva diócesis. Los cambios se limitaron a la creación de nuevas parroquias. *Íd.* pág. 28.

Años más tarde, como consecuencia de la Guerra Hispanoamericana, el tratamiento a la *Iglesia Católica, Apostólica y Romana* cambió sustancialmente. Ello, pues, con la cesión de Puerto Rico a los Estados Unidos se instituyen en el País las doctrinas constitucionales estadounidenses de separación Iglesia y Estado, y de libertad religiosa, lo que tuvo el efecto de que, a partir de ese momento, la Diócesis de Puerto Rico no contara con la protección de las autoridades civiles al igual que bajo la corona española. *Véase,* Aníbal

Colón Rosado, *Relations Between Church and Puerto Rico*, 42 Rev.

C. Abo. PR 51, 51-52 (1985); J. Gelpí Barrios, *Personalidad*

*jurídica de la Iglesia Católica en Puerto Rico,* 95 Rev. Esp.

Der. Canónico 395, 411 (1977).

Lo anterior motivó que, eventualmente, se presentara ante

el Tribunal Supremo de los Estados Unidos una controversia sobre

la capacidad de la Diócesis de Puerto Rico para poseer

propiedades. Al evaluar la referida controversia, en

*Municipality of Ponce v. Roman Catholic Apostolic Church in*

*Porto Rico,* 210 US 296 (1908), el Alto Foro Judicial Federal,

amparado en el Tratado de París del 10 de diciembre de 1898, le

reconoció personalidad jurídica a la *Iglesia Católica,*

*Apostólica y Romana*, Diócesis de Puerto Rico, para realizar

ciertos actos. Para fundamentar su decisión, el Tribunal Supremo

de los Estados Unidos hizo referencia al Art. 8 del Tratado de

París el cual, en esencia, dispone lo siguiente:

> [I]t is hereby declared that the relinquishment
> or cession, as the case may be, to which the preceding
> paragraph refers, cannot in any respect impair the
> property of all kinds, of provinces, municipalities,
> public or private establishments, **ecclesiastical or**
> **civic bodies, or any other associations having legal**
> **capacity to acquire and possess property in the**
> **aforesaid territories renounced or ceded,** or of
> private individuals, of whatever nationality such
> individuals may be. Tratado de París, Art. 8, par. 2
> (1898).

Así pues, el Alto Foro Judicial Federal interpretó que el

cuerpo eclesiástico al que se refería el Tratado de París, sólo

podía ser la *Iglesia Católica, Apostólica y Romana*, entiéndase

la Diócesis de Puerto Rico.[20] *Íd. pág. 31;* José Johel Monge Gómez, *La Permisibilidad De Lo "Impermisible": La Iglesia Sobre El Estado*, 41 Rev. Jur. U.I.P.R. 629, 633-34 (2007).

Ahora bien, lo cierto es que, desde entonces, la estructura organizacional de la *Iglesia Católica, Apostólica y Romana* en el País ha cambiado. La Diócesis de Puerto Rico, de ser sólo una, se convirtió en seis (6) Diócesis, a saber: la Arquidiócesis de San Juan, la Diócesis de Arecibo, la Diócesis de Ponce, la Diócesis de Mayagüez, la Diócesis de Fajardo-

---

[20] Asimismo, en dicho caso el Alto Foro Judicial de los Estados Unidos reconoció que el Tratado de París lo que hizo fue seguir la norma sobre el reconocimiento de personalidad jurídica a la *Iglesia, Católica, Apostólica y Romana* en el Derecho Internacional, en virtud del Concordato de 16 de marzo de 1851. Al respecto, el Tribunal Supremo de los Estados Unidos expresó:

> The Roman Catholic Church has been recognized as possessing legal personality by the treaty of Paris, and its property rights solemnly safeguarded. **In so doing the treaty has merely followed the recognized rule of international law which would have protected the property of the church in Porto Rico subsequent to the cession.** This juristic personality and the church's ownership of property had been recognized in the most formal way by the *concordats* between Spain and the papacy, and by the Spanish laws from the beginning of settlements in the Indies. Such recognition has also been accorded the church by all systems of European law from the fourth century of the Christian era. *Ponce v. Roman Catholic Apostolic Church*, *supra*, 323-24.

Ahora bien, sobre la personalidad jurídica de la *Iglesia Católica, Apostólica y Romana* el Concordato de 1851 establecía que:

> [L]a Iglesia tendría el derecho de adquirir por cualquier título legítimo, y su propiedad en todo lo que posee ahora o adquiera en adelante será solemnemente respetada. Por consiguiente, en cuanto a las antiguas y nuevas fundaciones eclesiásticas, no podrá hacerse ninguna supresión o unión sin la intervención de la autoridad de la Santa Sede, salvas las facultades que competen a los obispos, según el santo concilio de Trento. Concordato de 16 de marzo de 1851, Art. 41.

Así también, en el Art. 43 del Concordato de 1851 establecía que "[t]odo lo demás perteneciente a personas o cosas eclesiásticas, sobre lo que se provee en los artículos anteriores, será dirigido y administrado según la disciplina de la Iglesia canónicamente vigente", entiéndase el Código de Derecho Canónico.

Humacao y la Diócesis de Caguas. Al respecto, el Obispo de Ponce

para el año 1975, Fremiot Torres Oliver, explicó:

> **At the time of the cession only one diocese existed in Puerto Rico. At present there are five: the archdiocese of San Juan and the dioceses of Ponce, Arecibo, Caguas and Mayaguez. Each diocese is a fragmentation of one entity possessing juristic personality, and each enjoys the same legal status as the original Diocese of Puerto Rico, referred to in [Municipality of Ponce v. Catholic Church in Puerto Rico] opinion as ((The Roman Catholic Church in Puerto Rico)).** Rev. F. Torres Oliver, *Juridical Personality of the Church in Puerto Rico,* 15 Rev. Der. P.R. 307, 308 (1975).[21]

Dicho de otro modo, la Diócesis de Puerto Rico -- que en *Municipality of Ponce v. Catholic Church in Puerto Rico*, *supra,* es nombrada como la *Iglesia Católica, Apostólica y Romana* y, como tal, se le reconoció personalidad jurídica -- ha dejado de existir. Ésta se ha divido en una arquidiócesis y cinco (5) distintas diócesis, para un total de seis (6), y a cada una le corresponde una parte de lo que fue la Diócesis de Puerto Rico original. Por lo tanto, cada Diócesis y la Arquidiócesis tienen personalidad jurídica propia, conforme se le reconoció a la Diócesis original.[22]

2.

---

[21]Al momento de redactarse el mencionado artículo de la Revista Jurídica no existía todavía la Diócesis de Fajardo-Humacao, la cual incluimos en nuestro análisis.

[22] Así claramente se recoge en el artículo *Personalidad Jurídica de la Iglesia Católica en Puerto Rico*, del señor Juan Gelpí Barrios. En específico, el señor Gelpí Barrios expresa en el artículo lo siguiente:

> Cada diócesis es una fragmentación de un solo ente poseedor de personalidad jurídica. Cada una de ellas goza del mismo *status* legal correspondiente a la diócesis original de Puerto Rico, es decir, a la Iglesia católica romana de Puerto Rico. Gelpí Barrios, *supra,* pág. 410.

**El anterior dato es omitido en la Opinión que hoy emite el Tribunal.**

**Cónsono con dicha interpretación, el Código de Derecho Canónico -- el cual establece la estructura interna de la *Iglesia Católica, Apostólica y Romana* -- dispone que son las Iglesias Particulares, entiéndase, las arquidiócesis, las diócesis y las parroquias, las entidades que, dentro del esquema organizacional de la Iglesia, verdaderamente tienen personalidad jurídica.**

Así pues, el Código de Derecho Canónico establece que, la "Iglesia Católica y la Sede Apostólica son personas morales por la misma ordenación divina". Código de Derecho Canónico, Canon 113 sec. 1. No obstante, aunque la Iglesia es un ente moral, es decir abstracto e intangible, en el referido Código claramente se establece que "[e]n la Iglesia, además de personas físicas, hay también personas jurídicas, que son sujetos en derecho canónico de las obligaciones y derechos congruentes con su propia índole". Código de Derecho Canónico, Canon 113 sec. 2. **Es decir, la *Iglesia Católica, Apostólica y Romana,* como un todo, no es una persona jurídica, pero en ella sí existen personas jurídicas.**

Sobre este particular, el Canon 116 del Código de Derecho Canónico, en su sección 1, establece que:

> Son personas jurídicas públicas las corporaciones y fundaciones constituidas por la autoridad eclesiástica competente para que, dentro de los límites que se les señalan, cumplan en nombre de la Iglesia, a tenor de las prescripciones del derecho, la misión que se les confía mirando al bien público; las demás personas jurídicas son privadas. Código de Derecho Canónico, Canon 116 sec. 1.

En ese sentido, es a través de las Iglesias Particulares -- que son principalmente las diócesis y las parroquias – que

existe la Iglesia Católica. Código de Derecho Canónico, Canon 368. "La diócesis es una porción del pueblo de Dios, cuyo cuidado pastoral se encomienda al Obispo con la cooperación del presbiterio, de manera que, unida a su pastor y congregada por él en el Espíritu Santo mediante el Evangelio y la Eucaristía, constituya una Iglesia particular...". *Íd. Canon 369.* Esa "porción del pueblo de Dios" que constituye una diócesis queda circunscrita dentro de un territorio específico. *Íd. Canon 369.* El Obispo Diocesano es quien gobierna la Iglesia Particular y es quien representa la diócesis en todos los negocios jurídicos de la misma. Código de Derecho Canónico, Canon 393. Lo anterior, incluye también la Arquidiócesis, que es llamada así por ser la diócesis con mayor población dentro de ciertos límites geográficos.

Ahora bien, las arquidiócesis no tienen una categoría superior a las demás diócesis. Como ya mencionamos, una arquidiócesis es una diócesis circunscrita a un territorio de mayor población. Así pues, el Arzobispo es el Obispo de la Arquidiócesis. Este no tiene mayor autoridad que un Obispo Diocesano. *Véase*, Código de Derecho Canónico, Canon 435-438.

De otra parte, conviene mencionar aquí que, de ser necesario, "puede erigirse dentro de un mismo territorio, Iglesias Particulares distintas por razón del rito de los fieles o por otra razón semejante". Código de Derecho Canónico, Canon 372. "Corresponde tan solo a la suprema autoridad el erigir Iglesias Particulares, las cuales una vez han sido legítimamente

erigidas, gozan en virtud del derecho mismo de personalidad jurídica." *Íd.* Canon 373.

**Es decir, dentro del territorio de las diócesis podrán erigirse otras Iglesias Particulares -- entiéndase, parroquias -- y éstas también gozarán de personalidad jurídica. El Canon 513 del Código de Derecho Canónico así lo indica de manera expresa: "la parroquia legítimamente erigida tiene personalidad jurídica en virtud del derecho mismo".**

**A su vez, podrán erigirse también órdenes religiosas y otras organizaciones, que el Código de Derecho Canónico nombran como institutos religiosos. "Los institutos, las provincias y las casas, como personas jurídicas que son de propio derecho, tienen capacidad de adquirir, poseer, administrar y enajenar bienes temporales, a no ser que esta capacidad quede excluida o limitada por las constituciones". Código de Derecho Canónico, Canon 634 sec. 1. Entre estos institutos religiosos se encuentran aquellos que tienen como propósito la educación, es decir, las escuelas católicas.** "Se entiende por escuela católica aquella que dirige la autoridad eclesiástica competente o una persona jurídica eclesiástica pública...". Código de Derecho Canónico, Canon 803 sec. 1.

De otra parte, es menester aclarar que, como norma general, en Europa, como en los Estados Unidos, se ha formulado legislación que facilita la libertad de culto y que simultáneamente les reconoce personalidad jurídica a las entidades religiosas conforme a su estructura interna. *Véase,* *Facilitating Freedom of Religion or Belief: A Deskbook* (T.

Lindholm e*t al. ed.),* New York, 2004. En particular, sobre la *Iglesia Católica, Apostólica y Romana* de manera general se puede adoptar una de dos posturas: (1) reconocer la personalidad jurídica en virtud del Derecho Civil mediante legislación o (2) reconocer eficacia civil a las personas jurídicas eclesiásticas al amparo de la legislación canónica. Lourdes Ruano Espina, *La personalidad jurídica civil de las fundaciones canónicas en España,* 15 Ius Canonicum 155, 157 (2015). Esta última, el reconocimiento de la eficacia civil a las personas jurídicas formuladas por la *Iglesia Católica, Apostólica y Romana* es, a nuestro juicio, más acorde y respetuosa de la libertad de culto. *Id.* Es por ello que entendemos que, al hablar de personalidad jurídica, se deben seguir los lineamientos entablados en a su Código de Derecho Canónico. Interpretar lo contrario, es una intervención indebida sobre cómo se estructura la *Iglesia Católica, Apostólica y Romana,* y sobre cómo se organiza para la toma de decisiones.

**E. La Cláusula de Establecimiento y la Libertad de Culto**

Recordemos que la Primera Enmienda de la Constitución de los Estados Unidos prohíbe el establecimiento de una religión por parte del Estado y garantiza la libertad de culto. Emda. I. Const. EE. UU., LPRA, Tomo 1. Asimismo, la Constitución del Estado Libre Asociado de Puerto Rico establece que "no se aprobará ley alguna relativa al establecimiento de cualquier religión ni se prohibirá el libre ejercicio del culto. Habrá

completa separación de Iglesia y Estado". Art. II, Sec. 3, Const. ELA., LPRA, Tomo 1.

Cónsono con lo anterior, en nuestra jurisdicción, se prohíbe que el Estado incurra en actividades que constituyan el patrocinio de una religión, entiéndase el brindar apoyo económico a una entidad religiosa o el intervenir en sus actividades religiosas. *Díaz v. Colegio Nuestra Sra. del Pilar,* 123 DPR 765, 780 (1989); *Board of Educ. Of Kiryas Joel Village School Dist. V. Grumet,* 512 US 687, 704 (1994)*; Walz v. Tax Comm'n of City of New York* 397 US 664, 673 (1970). Para que una intervención con la cláusula de establecimiento se considere válida, debe superar el siguiente escrutinio: (1) que la conducta o ley impugnada tenga un propósito secular; (2) que su efecto primario no sea el promover o inhibir la religión; (3) que no conlleve la posibilidad de provocar una intromisión excesiva del gobierno en asuntos religiosos. *Colegio Nuestra Sra. del Pilar, supra; Lemon v. Kurtzman*, 403 US 602 (1971). *Véase, además, Diócesis de Arecibo v. Srio. Justicia,* 191 DPR 292, 311 (*2014*).

Ahora bien, el derecho a la libertad de culto no es uno absoluto. La libertad religiosa está limitada por la facultad del Estado para proteger la paz, la moral y el orden público. *Mercado, Quilichini v. UCPR,* 143 DPR 610, 636, (1997); *Sucn. de Victoria v. Iglesia Pentecostal*, 102 DPR 20, 22 (1974). *Véase, además, Diócesis de Arecibo v. Srio. Justicia*, *supra, pág.* 365.

En aquellos casos en que el Estado, con su conducta, tienda a limitar la libertad de culto, la parte que impugna la actuación del Estado es quien tiene la obligación de demostrar que la misma le impone una carga sustancial al ejercicio de la libertad de culto. *Asoc. Academias y Col. Cristianos v. E.L.A.,* 135 DPR 150, 161 (1994); *Díaz v. Colegio Nuestra Sra. del Pilar, supra,* pág. 779. *Véase, además, Diócesis de Arecibo v. Srio. Justicia, supra,* pág. 309. Ello implica, entre otras cosas, demostrar que la actuación gubernamental no es general porque va dirigida únicamente a la entidad religiosa y sus asuntos internos. *Véase, Díaz v. Colegio Nuestra Sra. del Pilar, supra; Asoc. Academias y Col. Cristianos v. E.L.A., supra; Mercado, Quilichini v. U.C.P.R., supra.* Una vez la parte que impugna la actuación del Estado demuestre que la conducta no es de carácter neutral, el tribunal deberá examinar si la misma supera el escrutinio estricto. En ese sentido el Tribunal deberá determinar si (1) el Estado tiene un interés apremiante; (2) la acción del Estado tiene como fin ese interés, y (3) no hay alternativas menos onerosas para lograr dicho interés. *Mercado, Quilichini v. U.C.P.R., supra. Véase, además, Lozada Tirado v. Testigos Jehová,* 177 DPR 893 (2010); *Diócesis de Arecibo v. Srio. Justicia, supra,* pág. 310.

Cónsono con lo anterior, en *Díaz v. Colegio Nuestra Sra. del Pilar, supra,* interpretamos que los tribunales no pueden ejercer su jurisdicción para dilucidar disputas sobre derechos de propiedad relativos a una iglesia cuando para hacerlo tengan que pasar juicio sobre materias de doctrina, de disciplina, de

fe **o de organización eclesiástica interna**. Ello, por ser necesaria la interferencia del Estado, a través de los tribunales, en materia que va dirigida al núcleo de la religión misma. Es decir, materia totalmente fuera de la competencia de los tribunales. *Díaz v. Colegio Nuestra Sra. del Pilar*, *supra; Amador v. Conc. Igl. Univ. De Jesucristo*, 150 DPR 571, 579-80 (2000). *Véase,* además, *Agostini Pascual v. Iglesia Católica*, 109 DPR 172 (1979); *Jones v. Wolf,* 443 US 595, 604 (1979).

Por consiguiente, en el ejercicio de nuestra facultad adjudicadora, y al momento de pasar juicio sobre asuntos como los que hoy nos ocupan, "debemos ser particularmente cuidadosos [...] para evitar malograr el delicado equilibrio entre los dos mandatos absolutos conflictivos: el de no establecer religión alguna y el de no inhibir el libre ejercicio del culto religioso". *Díaz v. Colegio Nuestra Sra. del Pilar*, supra, pág. 776. *Véase,* además, *Mercado, Quilichini v. U.C.P.R.,* *supra*, pág. 638.

Es, pues, a la luz de la normativa antes expuesta, que procedemos a disponer de las controversias traídas ante nuestra consideración.

III.

Como mencionamos anteriormente, en el presente caso, un grupo de maestros y maestras de las escuelas católicas del país presentaron una demanda de interdicto preliminar y permanente, sentencia declaratoria, incumplimiento de contrato, daños y perjuicios contra la *Iglesia Católica, Apostólica y Romana*, la Arquidiócesis de San Juan, la Superintendencia de Escuelas

Católicas de San Juan, la Academia del Perpetuo Socorro, la Academia San José y la Academia San Ignacio de Loyola.

Luego de varios trámites procesales, los cuales al comienzo de este escrito fueron narrados al detalle, este Tribunal determinó que procedía el interdicto preliminar a favor de los maestros y maestras demandantes. No obstante, el foro primario debía dilucidar quiénes, de los demandados, tenían personalidad jurídica para responderle a éstos.

Conforme a lo ordenado, el Tribunal de Primera Instancia resolvió que la Arquidiócesis de San Juan, las Diócesis, los colegios y la Superintendencia de Escuelas Católicas de San Juan carecían de personalidad jurídica para formar parte del presente litigio. Ello, pues las mismas eran dependencias de la *Iglesia Católica, Apostólica y Romana*, que, a su juicio, y en virtud del Tratado de París, era quien contaba con personalidad jurídica para ser demandada. Así pues, el foro primario ordenó a la *Iglesia Católica, Apostólica y Romana* que, mientras se resolvía el pleito, efectuase los pagos de la pensión a los maestros y maestras demandantes, conforme al Plan de Pensiones.

Insatisfechas con el dictamen del Tribunal de Primera Instancia, la Arquidiócesis de San Juan y la Superintendencia de Escuelas Católicas de San Juan presentaron un recurso de *certiorari* ante el Tribunal de Apelaciones. Dicho foro -- a nuestro juicio correctamente en cuanto a este aspecto -- revocó al Tribunal de Primera Instancia y determinó que, al amparo del Tratado de París y el Código de Derecho Canónico, la *Iglesia Católica, Apostólica y Romana* carecía de personalidad jurídica.

No obstante, el Tribunal de Apelaciones sostuvo que dentro de la estructura organizacional de la Iglesia las diócesis, las parroquias, las órdenes religiosas, entre otras organizaciones, sí tenían personalidad jurídica.

En lo que respecta a la Arquidiócesis de San Juan, el foro apelativo intermedio aclaró que ésta también tenía personalidad jurídica al igual que todas las diócesis en Puerto Rico. En cuanto a la Academia del Perpetuo Socorro, concluyó que ésta también tenía personalidad jurídica, pues está incorporada conforme a lo dispuesto por la Ley de Corporaciones, *supra.*

Ahora bien, en lo referente la Academia San José y la Academia San Ignacio de Loyola sostuvo que éstas carecían de personalidad jurídica. No obstante, dicho foro sentenció que la primera estaba cubierta por la personalidad jurídica de la Parroquia San José **-- quien no forma parte de este pleito, ni ha sido traída al mismo --** por ser una escuela parroquial y la segunda estaba adscrita a la Orden de la Compañía de Jesús en Puerto Rico, Inc., **-- quien no forma parte de este pleito y tampoco ha sido traído al mismo --** por lo que estaba cubierta por la personalidad jurídica de esta institución religiosa.

Por último, sobre el remedio provisional solicitado por los maestros y maestras demandantes, el Tribunal de Apelaciones razonó que sólo el Fideicomiso estaba llamado a responder directamente ante los beneficiarios del Plan de Pensiones con los bienes que le quedaban. No obstante, la Arquidiócesis de San Juan, las Diócesis, Parroquias y las escuelas católicas, que eran patronos, sólo estaban obligados a aportar al Plan.

En cuanto a la imposición del remedio sin prestación a fianza, como mencionamos anteriormente, el foro apelativo intermedio dispuso que la misma se hizo contrario a lo requerido por la Regla 56.3 de Procedimiento Civil, *supra,* por lo que la dejó sin efecto.

Inconformes con dicho proceder, los empleados demandantes recurrieron ante nos mediante *Moción de auxilio de jurisdicción y/o Solicitud de trámite expedito* y petición de *certiorari*. Así las cosas, luego de evaluar los planteamientos de todas las partes, una mayoría de este Tribunal revoca la sentencia emitida por el foro apelativo intermedio y resuelve que la *Iglesia Católica, Apostólica y Romana* tiene personalidad jurídica y, por lo tanto, es la llamada a responder al grupo de maestros y maestras de las escuelas católicas que presentó el litigio que hoy nos ocupa. Como ya adelantamos, de ese curso de acción disentimos enérgicamente.

Y es que, como adelantamos en la introducción de esta Opinión Disidente, no validaremos con nuestro voto un dictamen en extremo superficial, carente de un análisis profundo sobre las diversas dimensiones de las controversias ante nuestra consideración, en el cual una mayoría de este Tribunal, de forma contraria a la normativa antes expuesta, opta por reconocerle personalidad jurídica a un concepto abstracto y de carácter universal como lo es el término *Iglesia Católica, Apostólica y Romana*.[23]

---

[23] Es menester señalar que, al este Tribunal resolver que la Arquidiócesis de San Juan, la Superintendencia de Escuelas Católicas de San Juan, la Academia del Perpetuo Socorro, la Academia San José, (a través de

**Como ha quedado claramente demostrado, *la Iglesia Católica, Apostólica y Romana* no tiene personalidad jurídica. La personalidad jurídica que hoy una mayoría de este Tribunal erróneamente le concede a la *Iglesia Católica, Apostólica y Romana,* en nuestra jurisdicción, verdaderamente la tiene la arquidiócesis y las cinco (5) diócesis aquí establecidas, a saber: la Arquidiócesis de San Juan, la Diócesis de Arecibo, la Diócesis de Ponce, la Diócesis de Fajardo-Humacao, la Diócesis de Mayagüez y la Diócesis de Caguas. De igual forma, tienen personalidad jurídica las parroquias erigidas dentro de cada una de las diócesis y las órdenes religiosas.**

Así ha sido reconocido por este Tribunal en numerosas ocasiones en las que, en distintos pleitos que se han presentado ante nuestra consideración, le hemos reconocido personalidad jurídica a las diócesis de la *Iglesia Católica, Apostólica y Romana* y a sus parroquias. *Véase, Diócesis de Arecibo v. Srio. De Justicia*, *supra*; *Diócesis de Mayagüez v. Junta de Planificación*, 147 DPR 471 (1999); *Díaz v. Colegio Nuestra Sra. Del Pilar*, 123 DPR 765 (1989); *Academia San Jorge v. Junta de Relaciones del Trabajo*, 110 DPR 193 (1980); *Agostini Pascual v. Iglesia Católica, Diócesis de Ponce*, 109 DPR 172 (1979); *Vélez Colón v. Iglesia Católica, Apostólica y Romana, Diócesis de*

---

la Parroquia San José) y la Academia San Ignacio de Loyola (a través de la Orden de la Compañía de Jesús en Puerto Rico, Inc., mejor conocida como la Orden Jesuita) carecen de personalidad jurídica en el presente pleito, -- y determinar que sólo la *Iglesia Católica, Apostólica y Romana* tiene tal personalidad --, **ha dejado la causa de epígrafe sin partes**, ello debido a que la *Iglesia Católica, Apostólica y Romana* realmente subsiste a través de la arquidiócesis, las diócesis, las parroquias erigidas dentro de cada una de las diócesis y las órdenes religiosas.

*Arecibo*, 105 DPR 123 (1976); *Camacho v. Iglesia Católica, Apostólica y Romana, Diócesis de San Juan v. Registrador*, 95 DPR 511 (1968); *Iglesia Católica, Apostólica y Romana Diócesis de Ponce*, 72 DPR 353 (1951). Sin embargo, la Mayoría de este Tribunal parece olvidarlo.

No hay duda alguna que, en el presente caso, fueron demandados la Arquidiócesis de San Juan, el Fideicomiso y la Superintendencia de Escuelas Católicas de San Juan, quienes son partes en el pleito y tienen personalidad jurídica. De igual forma, la Academia del Perpetuo Socorro, quien como tal, cuenta con personalidad jurídica, fue correctamente demandada, y forma parte de este pleito.

Así pues, en la medida en que la Arquidiócesis y los mencionados institutos u organizaciones religiosas que se afectarían por los dictámenes emitidos por el Tribunal de Primera Instancia fueron correctamente traídos al presente pleito, éstos debieron ser considerados partes en el mismo, y, más importante aún, debieron haber tenido la oportunidad, en esta etapa de los procedimientos, de expresarse sobre la reclamación que aquí realizan los maestros y maestras demandantes; así como sobre la naturaleza del remedio provisional que se imponga en lo que el litigio se resuelve finalmente. En la medida en que eso no se hizo -- en la medida en que no se le permitió a la Arquidiócesis y a los mencionados institutos u organizaciones religiosas ser partes en la causa de epígrafe, expresarse, ser escuchados y participar de los procesos --, la **Resoluciones** y **Ordenes** emitidas por el Tribunal

de Primera Instancia, la cuales son objeto de revisión en el caso de marras, **y las que a todas luces tendrán un efecto sobre los entes con personalidad jurídica antes mencionados**, son nulas en toda su extensión. Ello así, pues las mismas se emitieron en violación al debido proceso de ley que le asiste a las partes de las que no se podía prescindir en el presente litigio, a las partes indispensables. Lo anterior, por sí sólo, y sin duda alguna, sería razón suficiente para disponer de la causa de epígrafe.

Ahora bien, precisa señalar también que, en cuanto a la Academia San José y la Academia San Ignacio de Loyola, quiénes fueron incluidas por los maestros y maestras demandantes en el presente caso, como ha quedado claramente demostrado, éstas carecen de personalidad jurídica. No empece a ello, conforme a la normativa antes expuesta, la Academia San José está cubierta por la personalidad jurídica que tiene la Parroquia San José y, la Academia San Ignacio de Loyola está cubierta por la personalidad jurídica que tiene la orden religiosa, Orden de la Compañía de Jesús en Puerto Rico, Inc. **La Parroquia San José, ni la Orden de la Compañía de Jesús en Puerto Rico, Inc., han sido traídas a este pleito, ni forman parte del mismo.**

Es decir, el presente caso adolece también de la ausencia de partes indispensables que permitan resolver adecuadamente las controversias ante nuestra consideración. Así pues, debieron acumularse en el pleito la Parroquia San José, la Orden de la Compañía de Jesús en Puerto Rico, Inc., y todas las diócesis que pudieran ser llamadas a responder por el pago de

la pensión, por concepto de retiro, que hoy los maestros y maestras demandantes exigen. Lo anterior, tampoco se hizo.

**En fin, ante las claras y crasas violaciones al debido proceso de ley habidas en el presente litigio, así como ante la ausencia de partes indispensables para la correcta adjudicación del mismo, no era ni es necesario -- como hizo el Tribunal de Apelaciones -- pasar juicio sobre los demás señalamientos de error. Procedía, sin más, decretar nulas en toda su extensión las *Resoluciones* y *Ordenes* emitidas por el Tribunal de Primera Instancia, las cuales son objeto de revisión en el caso de marras, y, en consecuencia, devolver el caso a dicho foro para que -- habiéndose ya determinado quiénes verdaderamente tienen personalidad jurídica en el presente caso -- celebre una nueva vista, de conformidad con lo sentenciado previamente por este Tribunal, para establecer quién o quiénes están obligados a continuar el pago de las pensiones objeto de este litigio en lo que el mismo es resuelto de forma final.**

IV.

Para concluir, es menester recordar que, al momento de dictar sentencia, los tribunales debemos asegurarnos de que el remedio que, en su día se emita, sea uno eficaz y capaz de cumplirse por la parte obligada. Por ello, las interpretaciones en derecho y los remedios provistos a su amparo deben ser posibles de cumplir. El dictamen emitido por este Tribunal presenta muchísimas interrogantes al respecto, a saber: ¿Cómo vamos ejecutar la sentencia? ¿A quién le vamos a exigir el cumplimiento, a una de las diócesis o a todas? De ahora en

adelante, ¿cómo vamos adquirir jurisdicción sobre la *Iglesia Católica, Apostólica y Romana*? ¿Bastará el diligenciamiento de un emplazamiento contra una sola de las diócesis para adquirir jurisdicción sobre la *Iglesia Católica, Apostólica y Romana*, o deberán emplazarse a todas las diócesis en nuestra jurisdicción? ¿Se hace extensivo este dictamen a las iglesias de otras denominaciones, como las Iglesia Metodista, Iglesia Bautista, Iglesia Adventista, Iglesia Episcopal, Iglesia Pentecostal, Iglesia Luterana, entre otras? Éstas son algunas de las problemáticas que presenta el dictamen que hoy se emite.

V.

Siendo ello así, disentimos del curso de acción seguido por una Mayoría de este Tribunal en el día de hoy. En consecuencia, hubiésemos modificado la Sentencia del Tribunal de Apelaciones, y así modificada, confirmaríamos la misma.


Ángel Colón Pérez
Juez Asociado